IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 24, 2003 Session

## HARRY DAVID JOHNSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sullivan County**
**No. C45,577     R. Jerry Beck, Judge**

---

**No. E2002-01949-CCA-R3-PC**
**January 15, 2004**

---

The petitioner, Harry David Johnson, was convicted in the Sullivan County Criminal Court of the first degree murder of his wife, Katherine Trotter Johnson, and he received a sentence of life imprisonment. Subsequently, the petitioner filed for post-conviction relief, alleging that he did not receive effective assistance of counsel during his trial. The post-conviction court held an evidentiary hearing, ultimately determining that the petitioner had failed to prove by clear and convincing evidence that trial counsel was ineffective. The petitioner timely appealed this ruling. Upon review of the record and the parties' briefs, we reverse the judgment of the post-conviction court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

W. Thomas Dillard and Charles W. B. Fels (on appeal and at trial); and Jeanne Wiggins (at trial), Knoxville, Tennessee, for the appellant, Harry David Johnson.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Joseph Eugene Perrin and Teresa Murray-Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

A. Trial

The petitioner was charged with the first degree murder of his wife.[1] The offense occurred on June 21, 1995. From the inception of the charges, the petitioner was represented by attorneys Robert Chad Newton and Paul Raymond Wohlford. Due to publicity surrounding the petitioner's trial, the jury was selected from Hamblen County and brought to Sullivan County. To assist in selecting the Hamblen County jury, Newton and Wohlford associated Gary E. Brewer, a Hamblen County attorney.

Brewer conducted the voir dire of the jury on May 9, 1997. During the voir dire, Brewer repeatedly told potential jurors that they would hear testimony at trial from psychiatrists or psychologists concerning the petitioner's depression, suicidal ideations, and family history of both conditions. Additionally, Brewer advised the jury that they would hear evidence concerning alcoholism and alcohol abuse by both the petitioner and the victim. Specifically, Brewer stated:

> We're talking about another problem; not only alcoholism, but a family trait on [the petitioner's] father's side of clinical depression and suicide.
> . . . .
> You will hear proof incident with these, the better part of what we're talking about, the clinical depression involving suicide. All on [the petitioner's] father's side. [The petitioner's] grandfather committed suicide. His brother, who was a professor of biology at East Tennessee State University, committed suicide. His brother had been diagnosed with clinical depression. And you will hear testimony that [the petitioner] suffers from depression. You will hear testimony in this case concerning the mind. You will hear psychologists testify.

In sum, Brewer contended, "This case is about alcohol abuse and alcoholism and it's about clinical depression and suicide."

After jury selection, the trial commenced on May 12, 1997. During opening statement, the prosecution indicated that defense experts would testify regarding the petitioner's state of mind at the time of the offense, specifically mentioning clinical depression and suicide. Brewer gave the opening statement for the defense. In his statement, Brewer advised the jury that despite her participation in several alcohol treatment programs, the victim was unable to conquer her addiction to alcohol. Following these failures, the petitioner became depressed. Brewer also noted that the petitioner had a family history of suicide and depression, specifically stating:

> As I told you Friday in Morristown this is a case about a good family that has been plagued by alcoholism and alcohol abuse.

---

[1] Throughout this opinion, it will be necessary for this court to refer to individuals possessing the same surname, namely the daughters of the petitioner and the victim, Arin Johnson and Whitney Johnson. To reduce confusion, we will refer to these individuals by their first names. We intend no disrespect to these individuals.

. . . .

> [T]he only thing [the petitioner] thought he could do was just – just
> to go ahead and kill himself. And I told you in Morristown on Friday
> there's a history of the family with suicide. His granddaddy killed
> himself. His brother, who was a professor over at E.T.S.U. in biology
> killed himself. His brother down in Atlanta has depression and takes
> depression medication.

Brewer conceded that the petitioner shot the victim in the face, remarking that "there's no question about that." However, Brewer pled with the jury to try to understand the appellant's "Hell." Brewer contended that the petitioner did not have the requisite mental state to have killed the victim with premeditation and deliberation, and thus, he could not be guilty of first degree murder.[2]

The following facts are taken from this court's opinion on direct appeal:

> The [petitioner] and the victim lived in an A-frame residence
> in a lake community on Friendship Road in Sullivan County. The
> [petitioner] is a pharmacist. The couple had two daughters, Whitney
> Johnson and Arin Bence Johnson, ages 20 and 22, respectively, at the
> time of trial. By all accounts in the proof, the victim suffered from
> chronic alcoholism and was given to bouts of intoxication despite
> several efforts to control her disease through rehabilitation. She was
> extremely intoxicated at the time of her death.

> Arin . . . testified for the defense that on June 21, 1995, the
> [petitioner] came home and had some words with the victim in the
> kitchen, which is located on the middle floor of the three-level home.
> The [petitioner] then went to the lower level and began folding
> blankets where he had been sleeping since "assault charges" were
> filed. Arin . . . testified the [petitioner] did not look like himself. His
> eyes looked "black," and he seemed sad, cold, distant, and depressed.
> His chin quivered. She had never seen him in that condition before.
> However, when she left to return to afternoon classes, the household
> was calm and there was no reason for alarm.

> Later in the afternoon of June 21, Whitney . . . went to the
> residence of her boyfriend, Bradley Jason Fields, and called home to

---

[2] At the time of the shooting death of the victim, first degree murder was defined as the "intentional, premeditated and deliberate killing of another." See Tenn. Code Ann. § 39-13-202(a)(1) (1991). Shortly after the instant offense, the statute was changed, deleting the requirement of deliberation. See Tenn. Code Ann. § 39-13-202(a)(1) (1995).

tell her father that she was going to a meeting. She became upset when the [petitioner] hung up on her. Because she was worried, she asked Fields's mother and sister to drive her home. When she arrived at the Johnson residence a half hour later, she found a note affixed to the door of the house, although she did not read it at that time. She was concerned about the welfare of the [petitioner], went to look for him, and found him at the rear of the house seated in a swing with a shotgun propped up against a tree nearby. She testified the [petitioner] "wasn't the person that I knew." The [petitioner] told her that had she not called earlier, she would have found him dead. They sat in the swing and talked for about 30 minutes. Bradley Jason Fields arrived and entered the Johnson home. Whitney . . . joined him in the kitchen, and they began to make some tea. When they discovered they were out of sugar, the [petitioner] drove to a store to buy sugar. When he returned, Whitney . . . made tea, and she and Fields went to her bedroom to watch television. The [petitioner] was in the lower level of the house.

Sometime later the [petitioner] went from the lower level to the third floor where the victim's bedroom was located. Whitney . . . heard "a thunk" and went upstairs to see what happened. The victim was sitting on the bedroom floor, and the [petitioner] was sitting on the edge of the bed. The victim was "snarling" at the [petitioner] who had the "look of a black hole type person." The [petitioner] became enraged. He "smacked" the victim and said he was going to shoot her. He left the room very quickly and went downstairs. As he came back very quickly from the lower level with the shotgun, Whitney . . . met him and tried to get the gun away from him. She testified the [petitioner] was "screaming, out of control." He loaded the gun and ran upstairs to the third-floor bedroom where the victim had remained. Whitney . . . testified that only seconds elapsed between the [petitioner] running upstairs and the firing of a shot.

Bradley Jason Fields . . . testified for the state [regarding] the June 21 events. He stated that the victim was intoxicated and, in his opinion, could not walk. He testified that after the [petitioner] returned from his errand in his car, the [petitioner] played with the family dogs for several minutes and seemed calm. However, later the [petitioner] went upstairs and threatened to kill the victim. The [petitioner] come down the stairs, passed Fields in the kitchen area, and proceeded to the lower level to the gun cabinet. Fields followed him down the stairs, and the [petitioner] said, "I was going to kill that bitch." The [petitioner] obtained the shotgun and the box of shells

and rambled about the victim not getting his money and that he was going to kill her. Fields tried to stop him, and the [petitioner] ordered Fields out of the way. Frightened, Fields stepped back, allowing the [petitioner] to go upstairs. Fields went to the second floor and watched and heard the confrontation from the kitchen-great room area. The bedroom opened onto a balcony which was visible through an atrium from the second-floor kitchen-great room area. Fields testified that the [petitioner] pulled the victim off the bed onto the floor, pointed the gun at her, and told her he was going to kill her. The [petitioner] told the victim she was not going to get his money and that he was tired of living the way he had been. Fields pleaded with him not to kill the victim. He described the [petitioner] looking at him and saying that he had to do what he had to do. During this time, the victim was hollering Fields's name. This situation continued for about five minutes before the [petitioner] fired the fatal shot and came running downstairs. When the [petitioner] reached the kitchen level, he began looking for the shells which Fields had hidden under a pillow. The [petitioner] stated "I killed her," laid the gun on a couch on the lower level, and left the house.

Fields went upstairs and discovered the victim had been shot in the head. The [petitioner] drove off in his automobile but returned to the home a few minutes later at the same time the first law enforcement officer arrived. This officer arrested the [petitioner] and described the [petitioner] as merely standing in the driveway, not crying or shaking. The officer, whose weapon was drawn, three times ordered the [petitioner] to raise his hands before the [petitioner] complied. The [petitioner] spoke only to ask the officer if the officer knew who he was.

The note which Whitney . . . initially saw affixed to the door was introduced into evidence. It was addressed to "Whit and Arin" and was signed off by "Dad." It expressed "frustrations of life in general" and stated that "I can't fix things that are unfixable. I love you both, but if there is a basement in hell, I can assure you that your mother will be firing the furnace!!" The note concluded, "I really haven't planned for this but . . . things will work out."

During Arin['s] direct testimony as a defense witness, she mentioned that her father had been sleeping on the lower floor "since the assault charge." Before cross-examination, the trial court conducted a jury-out hearing to rule on the state's request to be allowed to ask the witness about the assault charge. The trial court

granted the state's request, and upon cross-examination, Arin . . . testified that in May 1995 the [petitioner] had been charged with assault against the victim. She testified that the [petitioner] returned from jail, apologized to the family, told them it would not happen again, and then told Arin that he would kill her mother before he would go back to jail. Furthermore, Arin . . . testified that her parents mutually drank and argued and that sometimes Arin had to physically intervene. The [petitioner] continued to drink in front of the victim after she had undergone rehabilitation programs and sometimes offered alcoholic beverages to [her]. Arin . . . stated that, on the day of her mother's death, she had planned to take her mother out of the house for her safety but that the victim was in no condition to leave. On redirect examination, Arin . . . said that the [petitioner] had stopped talking to the daughters. "If mom was sober, then everything was fine, and if it wasn't, nobody said anything to each other." She said that as the victim's drinking got worse, the [petitioner's] did also.

During Whitney['s] direct testimony as a defense witness, she stated that before the shooting the [petitioner] was in "a rage that I have never seen before in my life." Before the state's cross-examination, the trial court held a jury-out hearing to determine the admissibility of evidence of prior acts of domestic violence that were "a part of this family," to show that the [petitioner's] rage prior to the shooting was not unprecedented. The trial court granted the state's request, and upon cross-examination before the jury, Whitney . . . testified that she had previously seen the [petitioner] in [another] rage. On that occasion, the [petitioner] had assaulted the victim, and Arin . . . had placed the victim in Arin's car and was about to drive her to the hospital. The [petitioner] attacked the car with a sledge hammer and broke out the car windows with Arin and her mother seated inside.

At trial, the defense conceded that the [petitioner] shot and killed the victim but argued that the [petitioner] was incapable of premeditation and/or deliberation. The [petitioner] did not testify.

State v. Harry David Johnson, No. 03C01-9712-CR-00526, 1999 WL 318830, at **1-3 (Tenn. Crim. App. at Knoxville, May 17, 1999).

During closing arguments, the State emphasized:

Think of what you've heard during the course of these two and a half days. You've heard two daughters who love the only parent they have left. Tell you about his anger or his rage. There's no evidence of depression. There's no medical personnel or doctor or psychiatrist who told you about clinical depression or about suicide. Just the words of his daughters. And remember the word of Brad Fields. He had threatened suicide before. This wasn't the first time.

. . . .

And had you not been paying close attention, you might not have realized that earlier in the week when the defense attorney said – about this case is about alcohol abuse and a clinically depressed person. You haven't heard no [sic] evidence that the defendant was clinically depressed. You have heard of no evidence of any kind of diagnosed depression or treatment from it. You have heard none of that. So when you go back to the jury room, please keep in mind what this case is decided upon and that's what came from that stand and not what came from this podium.

After deliberation, the jury found the petitioner guilty of first degree murder and the trial court imposed a life sentence. This court affirmed the petitioner's conviction on direct appeal.

## B. Post-Conviction

After this court's affirmance of his conviction, the petitioner timely filed a petition in the Sullivan County Criminal Court seeking post-conviction relief. In his petition, the petitioner specifically alleged that he received the ineffective assistance of counsel:

> (1) when counsel promised jurors in voir dire and opening statement that a mental defense would be offered then rested without offering any mental defense or any consistent or coherent theory of defense;
>
> (2) when lead counsel did not seek a pretrial ruling on the admissibility of 404(b) evidence nor did he brief the issues in anticipation of trial;
>
> (3) because lead trial counsel did not accurately assess the evidence supporting the possibility of a first degree murder conviction;
>
> (4) when lead counsel did not cross-examine the sole eyewitness (Fields) called by the State;

-7-

(5) when lead trial counsel failed to obtain and use evidence of voluntary intoxication as it was relevant to the question of mens rea for the offense of first degree murder;

(6) when lead counsel failed to obtain or use <u>Jencks</u> material that was relevant to the defense;

(7) because lead counsel did not recommend or seek prompt professional help for the petitioner; and

(8) when lead trial counsel failed to prepare and submit a clear and adequate set of jury instructions for the court's consideration.[3]

The petitioner also contended that it was plain error for the trial court to fail to give proper jury instructions. Prior to the evidentiary hearing on the petitioner's post-conviction claims, the post-conviction court recited a brief history of the case and noted that Newton had died of cancer prior to the commencement of the petitioner's post-conviction action.

As his first witness, the petitioner called Dr. Robert L. Sadoff, a psychiatrist from Philadelphia, Pennsylvania. Dr. Sadoff testified that he was not involved with the petitioner's case during trial, but he had examined the petitioner in preparation for the post-conviction proceeding. During his analysis of the petitioner, Dr. Sadoff discovered that petitioner's paternal grandfather and the petitioner's brother had both committed suicide. Additionally, a number of the petitioner's relatives, including his father and brothers, suffered from depression. Furthermore, there was a history of alcohol abuse among the male members of the petitioner's family.

Dr. Sadoff theorized that the petitioner had become increasingly depressed as he lost control of the situation at home. The doctor attributed the petitioner's perceived loss of control to the victim's alcoholism and the progressively more violent and cantankerous relationship between the victim and the petitioner. Specifically, Dr. Sadoff noted that during his evaluation of the petitioner, he discovered that prior to the murder there had been several instances of violence between the petitioner and the victim. Dr. Sadoff related that three years prior to the victim's death, the petitioner put a shotgun into her mouth in an attempt to "sober her ass up." Additionally, on one occasion the petitioner fired his shotgun from the deck outside the family home in order to see if anyone cared enough about him to investigate the shot. Dr. Sadoff described the petitioner's behavior as "pretty desperate" and "a cry for help." Dr. Sadoff opined that the petitioner would not ask for help because he was accustomed to being in control and helping everyone else. Dr. Sadoff also opined that the petitioner's condition worsened after 1993 when the victim's alcohol consumption increased.

---

[3] The petitioner's claims of ineffective assistance of counsel relate only to Newton.

Dr. Sadoff stated that on the day of the shooting, the petitioner wrote a "suicide note" on his home computer.[4] The note was written in a "childish font" and contained backwards letters. Prior to the shooting, the petitioner sat with a loaded shotgun in his lap, but was dissuaded from killing himself by his daughter, Whitney. Dr. Sadoff's investigation revealed that during this conversation with Whitney, the petitioner was "clearly very depressed," and was "agitated," "shaking," and "crying."

Immediately preceding the offense, the petitioner went upstairs to tell the victim how he was feeling, and she responded, "Why don't you go ahead and shoot. You're not worth the ground you walk on." Dr. Sadoff contended that the petitioner lost control due to the victim's taunting, which taunting "pushed [the petitioner's] button." The petitioner then vowed that he would kill the victim. The petitioner obtained a shotgun, loaded the gun, and threatened Whitney and Fields if they did not get out of his way, stating that "I've got to do what I've got to do. Don't try and stop me." Dr. Sadoff described the petitioner as "like a runaway train who was not to be stopped." Dr. Sadoff noted that subsequent to shooting the victim, the petitioner looked for additional shotgun shells with which to kill himself, but Fields had hidden the shells where the petitioner could not find them. Dr. Sadoff maintained that the petitioner was in a "very passionate state."

Dr. Sadoff noted that the petitioner had some amnesia relating to the events. Dr. Sadoff believed that the loss of memory could be attributed at least in part to the extreme tension and emotion of the day. Dr. Sadoff explained that the petitioner was suffering from a serious mental

---

[4] The petitioner's "suicide note" stated:

Whit and Arin

This is a really difficult letter to write. I suppose that it is a way of trying to relate to you the frustrations of life in general.

I work hard at being a dad, husband, pharmacist and all around good citizen. I am told by your mother that I am a male chauvinist control freak. I go to my "class" and am reminded of how wrong I am, how abusive I am and what an asshole I am. Things are reinforced by Arin and you, as I play my role as father, which means taking care of everything, including Mom's duties as well. I do not have all the answers; I cannot do it all by myself. I can't fix things that are unfixable.

I love you both, but if there is a basement in hell, I can assure you that your mother will be firing the furnace!!

I really haven't planned for this but between Mr. Bill, Mike and Dick things will work out.

I love you both,

Dad

6-21-95

defect at the time of the shooting, namely major depressive disorder with dissociative elements. Dr. Sadoff testified that the petitioner killed the victim because he felt that it was necessary. Dr. Sadoff explained, "My opinion is that he did not lack substantial capacity to appreciate the wrongfulness of his behavior. His cognitive process[es] were intact. It was his emotional and volitional aspects that were not functioning for him at that time."

Dr. Sadoff acknowledged that during his investigation, he learned that prior to the victim "pushing the [petitioner's] button," the petitioner knocked her out of bed. The history of the family revealed that a pattern of abusive behavior existed on the part of both the petitioner and the victim; however "there were verbal abuses [by the petitioner] to the children when he was drinking."

Dr. Sadoff related an incident in which the petitioner beat the victim so severely that Arin did not believe her mother would survive. Arin attempted to drive the victim to the hospital. However, the petitioner "didn't want his image spoiled." Therefore, the petitioner prevented them from seeking medical attention by throwing a sledge hammer through the windshield of the car Arin was driving. Dr. Sadoff noted that the petitioner was "very controlling." Additionally, Dr. Sadoff acknowledged that after the shooting, the petitioner asked his daughters, "[D]on't you feel the relief here?"

Dr. Sadoff explained that the victim's alcoholism was extreme. She was frequently intoxicated to the point of immobilization and would repeatedly soil the bed by vomiting, urinating, or defecating. The petitioner continuously cared for the victim and cleaned up following these incidents. Dr. Sadoff stated that the victim was unable to stop drinking, but he conceded that the petitioner often drank in front of the victim immediately following her completion of treatment programs.

Dr. Sadoff admitted that the petitioner had not been treated for depression and that he had not been otherwise diagnosed with "major depressive disorder." He also acknowledged that the petitioner was very competent in managing his business. Dr. Sadoff explained that the petitioner had a public persona and a private persona. The petitioner's children related that his behavior "changed at the bridge" on his way home from work.

Dr. Sadoff noted that there were conflicting reports concerning the petitioner's behavior on the day of the shooting. Specifically, he explained, "I notice that they were mixed in that, because on one hand they said he was like he's always been; another they said he was different from he's ever been because of the look in his eye and the shortness of his response and his suicidal ideations. So they were saying two different things at different times. It was confusing." Dr. Sadoff stated that during his examination of the petitioner, the petitioner never admitted having suicidal thoughts. However, Dr. Sadoff opined that the petitioner was a "very private, personal person" and would not want to show any weakness to the community.

Dr. Sadoff related that the petitioner was placed on "suicide watch" for eleven days when he was jailed immediately after the shooting. Dr. Sadoff acknowledged that the petitioner never

threatened suicide while in jail or after he was released on bail. Nevertheless, the doctor opined that the petitioner would have killed himself on the night of the shooting if he had been able to find shells for the shotgun. Dr. Sadoff acknowledged that there were other guns in the house that the petitioner could have utilized to kill himself.

Dr. Sadoff opined that it was a mistake not to have the petitioner evaluated until six to seven months after the shooting. The doctor maintained that the petitioner was in need of treatment following the offense. Dr. Sadoff stated, "The sooner you see somebody, the better information you've got, and the sooner you can start effective treatment; especially when he's in the acute phase."

Dr. Sadoff concluded by noting that he had reviewed the report prepared by Dr. Emil F. Coccaro, a psychiatrist with the Eastern Pennsylvania Psychiatric Institute who evaluated the petitioner. The report was dated June 1996. Dr. Coccaro stated that the petitioner's "major depression [was] in full remission" by September 1995.

The next witness to testify on behalf of the petitioner was Dr. Thomas Edward Schacht, a psychologist and professor in the Department of Psychiatry and Behavioral Sciences at East Tennessee State University. Dr. Schacht asserted that he was contacted by attorneys Newton and Wohlford in November 1995 regarding the petitioner's case. In January 1996, Dr. Schacht met with the petitioner in order to perform a forensic evaluation to determine whether evidence existed of any mental illness or impairment. As a result of this evaluation, Dr. Schacht concluded that "credible forensic evidence" existed indicating that the petitioner suffered from mental illness at the time he shot the victim. Specifically, Dr. Schacht opined that at the time of the shooting the petitioner suffered from "Affective Disorder in the depressive spectrum. Major Depressive Disorder was the most likely diagnosis. . . . And then the other diagnosis was alcohol abuse." The "most compelling feature" of the petitioner's disorder was his "acute suicidal state." Dr. Schacht noted that the petitioner had been "episodically suicidal over a period of several years."

Moreover, Dr. Schacht related that Arin and Whitney both reported that the petitioner had been drinking vodka on the day of the shooting. Dr. Schacht explained that "alcohol will disinhibit an individual" and contribute to emotional instability, irritability, and depression. Additionally, the petitioner's mental illness would substantially affect his ability to conform his behavior to the requirements of the law. Further,

> there would have been ample grounds for [the petitioner] to have
> been committed to a hospital involuntarily. And the whole premise
> of such a commitment is that it occurs because an individual is unable
> to regulate their own behavior and unable to refrain from acting in a
> way that might harm themselves or others.

Dr. Schacht testified that during his investigation, he discovered that the night before the shooting Arin had a car accident which prompted a confrontation with the petitioner. Whitney and Arin told Dr. Schacht that the next day, the day of the shooting, the petitioner seemed "dazed [and]

-11-

slowed." The petitioner's talk of suicide came and went throughout the day. The victim had been on an extended drinking binge in which she had repeatedly soiled herself while in bed because she would not or could not get up to go to the bathroom. Whereas the victim had previously intervened in the petitioner's attempts to kill himself, on the day of the shooting she encouraged the petitioner to commit suicide. The petitioner became enraged by her reaction. Dr. Schacht concluded that Fields engaging the petitioner in conversation prior to the shooting delayed the shooting of the victim.

Dr. Schacht noted that the petitioner had a history of depressive episodes and a history of alcohol consumption. Additionally, the petitioner had a strong family history of affective disorder, with both his brother and his grandfather committing suicide and other siblings having mood disorders and drinking problems.

Furthermore, Dr. Schacht recounted several abusive incidents between the petitioner and the victim. Specifically, Dr. Schacht related an incident in which the petitioner placed a shotgun into the victim's mouth in order to "scare her into sobriety." He also testified regarding the petitioner firing guns to test his family's concern for him and the petitioner's repeated threats of suicide. Dr. Schacht opined that such conduct was consistent with mental illness. Based upon his assessment, Dr. Schacht referred the petitioner to Dr. Coccarro for testing in relation to depression. However, the results of Dr. Coccaro's tests were "equivocal."

Dr. Schacht stated that the delay in evaluating the petitioner was "undesirable" and made it more difficult to determine the petitioner's state of mind at the time of the shooting. The better practice would be to evaluate an individual when the phenomenon is "alive and active." Dr. Schacht stated that he knew no reason for the delay in evaluating the petitioner.

Dr. Schacht discussed his findings and the findings of Dr. Coccaro with Newton and Wohlford on several occasions. He explained, "Basically I prepared them to examine me." Dr. Schacht prepared an outline of his proposed testimony for counsel to review. Dr. Schacht was prepared to testify at the petitioner's trial in May 1997. However, Dr. Schacht "was told in the middle of the trial that the defense had decided to rest because they had concluded that the prosecution had failed to prove its case."

Dr. Schacht testified that he was aware of several prior acts of abuse by the petitioner toward the victim that could potentially have been revealed at trial. In fact, Dr. Schacht had expected the bad acts to be revealed. He stated that "[t]here was a problem in this case with anger and with aggression." Dr. Schacht discussed the previous acts of abuse with counsel, and, during his testimony, Dr. Schacht intended to explain how the acts were indicative of the petitioner's declining mental health. If the bad acts had not been introduced through other testimony, Dr. Schacht planned on testifying regarding the events in order to illustrate and explain the petitioner's declining mental health. Dr. Schacht stated that the existence of such incidents of violence would not change his diagnosis of the petitioner.

Prior to trial, Dr. Schacht "draft[ed] a detailed written outline of what my expected testimony would be." In this outline, he described the shooting of the victim as an "incomplete murder-suicide." At the post-conviction hearing, Dr. Schacht asserted that his assessment of the petitioner's suicidal ideations was not changed by the fact that the petitioner did not use another of the guns located in the house to commit suicide when he could not find more shells for his shotgun. Dr. Schacht testified that when an individual is "acutely suicidal . . . obvious alternatives don't occur to them." Also, Dr. Schacht noted that the petitioner had a "substantial capacity for self deception" and was vulnerable to pride. Furthermore, Dr. Schacht opined that the note written by the petitioner on the day of the shooting was a suicide note because the content of the note involved "helplessness, hopelessness, despair." Additionally, the note was written on the computer in a "childish" font.

Lieutenant Ty Boomershine testified at the post-conviction hearing that on the day of the shooting, he was a Sergeant with the Sullivan County Sheriff's Department, and he was the investigating officer in the petitioner's case. He stated that the "suicide note" was part of the police file in the petitioner's case. Additionally, the police file contained a copy of the 911 tape wherein Whitney telephoned for assistance after the shooting and a bottle of Popov vodka which was recovered from the petitioner's house on the night of the shooting. The vodka bottle was partially empty and supported the reports of Whitney and Arin that the petitioner had been drinking on the day of the shooting. Lieutenant Boomershine maintained that the petitioner's counsel reviewed the police file prior to trial.

Lieutenant Boomershine stated that at the time of the shooting, police administrative protocol required that anyone arrested for first degree murder, especially in domestic violence cases, be placed on suicide watch. Additionally, Whitney had stated that she believed the petitioner would kill himself. However, Lieutenant Boomershine was unaware of any attempts by the petitioner to end his life while in jail.

Paul Raymond Wohlford testified that he was an attorney in Bristol and, at the time of the post-conviction hearing, had been practicing law for thirty-seven years. For approximately twelve years, he had limited his practice to mostly divorce, medical malpractice, wrongful death, and juvenile cases. He stated that he had an AV rating from Martindale-Hubble, noting that AV is the highest professional rating for an attorney. Wohlford admitted that he had little experience in criminal law and had never held himself out to be a criminal defense attorney.

In 1995, Wohlford was practicing law with Robert Chad Newton. Newton was a criminal defense attorney. The petitioner had been Wohlford's pharmacist for years and they were friends. Wohlford was aware that the victim "drank inappropriately." Therefore, when Wohlford heard about the shooting, he called Newton to go to the jail with him to visit the petitioner and offer assistance. Wohlford stated that he saw the petitioner at 10:30 p.m. the night of the shooting. When Wohlford and Newton arrived at the jail, the petitioner was quiet and "appeared very depressed." The petitioner did not appear intoxicated at that time. The petitioner later informed Dr. Schacht that he had drunk only three to four shots of vodka prior to the shooting.

-13-

Wohlford recalled that after the arraignment the following day, Newton discussed the case with Wohlford. Both attorneys were of the opinion that the crime "did not meet the qualifications of what was then the definition of First Degree Murder in that we thought perhaps he was suicidal, perhaps very depressed, and that he could not form the deliberation necessary for that intent." In fact, Newton never believed that the case was "more than Second Degree [murder]" because "the element of passion was . . . very difficult. The element of [the petitioner's] dysfunctional emotional system was very strong and he felt the State could not meet their burden of proving all the - of what were then the elements of first degree murder."

Within the next couple of days, Wohlford became aware that the petitioner was on suicide watch at the jail. However, without further explanation, Wohlford testified that "there was no immediate idea of having [the petitioner] examined or placed in a . . . mental health facility."

When allocating responsibilities for trial, Wohlford and Newton determined that Wohlford would handle all expert testimony on direct and cross-examination because of Wohlford's experience with expert witnesses. Newton would be in charge of the case because of his experience in criminal defense. Newton chose Dr. Schacht as the defense's mental health expert because he had worked with Dr. Schacht on a prior occasion and was impressed with his work.

Wohlford believed Newton to be an "excellent lawyer in the criminal sphere." However, Wohlford was concerned about the strength of the State's proof. Wohlford stated that he was aware that the petitioner had been drinking on the day of the shooting. Wohlford and Newton discussed a voluntary intoxication defense, but Newton maintained that it would not be "a very successful defense to assert because his experience indicated to him that juries simply did not take to heart the fact if someone voluntarily drank themselves into intoxication and committed a crime that they should be absolved of responsibility for it."

As part of his duties relating to the petitioner's case, Wohlford talked with Dr. Schacht on several occasions and prepared him to testify at trial. Dr. Schacht believed that the petitioner "was incapable of forming the cool purpose and - and deliberation as required [for first degree murder]." Dr. Schacht further believed that the victim's inability to rehabilitate "had eroded [the petitioner's] ability to cope." Wohlford shared this information with Newton.

Wohlford stated that he was unaware of the existence of an audio tape recording of the 911 telephone call made by Whitney on the day of the shooting. Wohlford was further unaware of any statements made by the witnesses to Officer Delp prior to trial. However, Wohlford maintained that Newton, as lead counsel, would have been privy to such information.

Wohlford testified that Newton decided to present a defense of "diminished capacity" during trial and that proof of such defense would be presented through lay and expert testimony. Wohlford opined that Dr. Schacht was "very professional . . . and could handle himself, I thought, well in the courtroom." Dr. Schacht's final report stated that the petitioner suffered from clinical depression.

-14-

Wohlford was also prepared to examine the State's expert witness, Dr. James Ballenger. Wohlford interviewed Dr. Ballenger in preparation for the case. Wohlford maintained that Dr. Ballenger

> was an expert in, I think, anxiety disorders and perhaps depression, but he was not, in my opinion, a forensic witness that was in court . . . in matters of diminished capacity, competency, and that sort of thing on a regular basis. . . . I felt Dr. Schacht would be a better, for the lack of a . . . term, better witness than Dr. Ballenger because I - I felt that I had some, perhaps, ways to cause his testimony to be looked at askance by the jury.

Wohlford explained that he had prepared an outline for the cross-examination of Dr. Ballenger. Wohlford testified that he "couldn't wait" to cross-examine Dr. Ballenger regarding who had paid him to examine the petitioner. Wohlford knew that Dr. Ballenger had been paid by the victim's family to perform the examination of the petitioner and was prepared to attack Dr. Ballenger's potential bias in his assessment of the petitioner. Wohlford kept Newton apprised of his assessment of the expert witnesses. Wohlford testified that he was fully prepared to question both expert witnesses.[5]

Wohlford explained that Brewer was associated as counsel after the trial court determined that the jury would be selected from Hamblen County. Wohlford acknowledged that Brewer's practice was comprised of mostly civil cases. However, as a Hamblen County attorney, Brewer was familiar with the prospective jurors. Therefore, counsel determined that Brewer would be solely responsible for the voir dire of the jury. Wohlford and Newton discussed their trial strategy with Brewer so that he would know the proper questions to ask during voir dire. Based upon the defense theory, Brewer repeatedly questioned prospective jurors regarding their opinions concerning alcohol abuse, clinical depression, and suicide. Brewer further advised the jury that it would hear expert testimony on those issues.

In addition to jury selection, Brewer also interviewed Arin and Whitney in preparation for trial. Brewer developed a good rapport with the petitioner's daughters and the attorneys decided that he should handle their direct testimony at trial.

Wohlford testified that the trial testimony of Fields ended just before lunch. Newton requested an early lunch recess, advising the court and the jury that he expected the cross-examination of Fields would be lengthy and he preferred that it not be interrupted by lunch. The trial court granted the request. Wohlford asserted that he, Newton, and Brewer met during lunch and discussed how damaging Fields' testimony had been. Wohlford acknowledged that Fields' testimony "made it very difficult for the defense." Counsel discussed the fact that the State had not

---

[5] Defense counsel decided not to call Dr. Coccaro to testify at trial. The petitioner does not claim error in regards to this decision.

brought out other potentially damaging information known by Fields. Wohlford stated that damaging information that might be revealed during cross-examination "was a worry that we might – something might get in that we - we have no intention of having get in and then we may be stuck with it as far as it goes."

Counsel considered a limited cross-examination so that Fields could "bring out about earlier in the day and [the petitioner's] suicidal mentality and the fact that he had a gun and the fact that he may have written a note," yet avoid any more damaging topics. The petitioner was present for this discussion. Wohlford noted that Newton

> quite properly pointed out that Mr. Fields might worsen the matter for the defense by going into areas that had not been covered on direct that would be harmful to him. So we knew that was a potential and it may be that . . . [Newton] did not discuss these decisions with either [Brewer] or I [sic], but it . . . may have been that - that he felt that it would worsen the situation for [the petitioner] in - in this cross-examination.

Regardless, Wohlford believed that counsel had an opportunity for a successful limited cross-examination of Fields which could have "made a connection between . . . an eyewitness and what the expert says." Nevertheless, when trial resumed, Newton informed the trial court that the defense would not cross-examine Fields. Wohlford noted that "whether to cross-examine or not cross-examine, I did not really participate in that decision [sic]. I - I really left that to [Newton] as far as that goes."

Wohlford explained that Newton was concerned that Fields might mention prior acts of abuse committed by the petitioner. However, Newton did not pursue a pretrial hearing under Rule 404(b) of the Tennessee Rules of Evidence for a ruling on the admissibility of such testimony. Wohlford recalled that the trial court stated that prior bad acts issues could be addressed either pretrial or during trial. Wohlford also stated that the petitioner's case had been highly publicized. Wohlford opined that if a hearing on Rule 404(b) issues had been held prior to trial, "there's a good chance that there would have been a lot more publicity concerning the prior bad acts than . . . would have come up during the trial after a jury was selected."

Wohlford opined that Newton was prepared to handle any Rule 404(b) issue that may have arisen at trial because Wohlford was confident of Newton's intelligence and ability to retain the law. "[Newton] could quote and did remember cases and passages from them and what they held and what they said." In any event, Wohlford asserted that Dr. Schacht

> was prepared to testify that these acts were mileposts on [the petitioner's] road to . . . his personality disintegration. In - in other words, rather than trying to - to avoid them entirely or to deny that they happened, but to say, yes, this happened but that's consistent

-16-

with the expert opinion that was going on in [the petitioner's] mind over time as this repetitive behavior on his wife's part continued.

Upon being questioned about the failure to present expert testimony regarding the petitioner's mental state, Wohlford testified that the decision not to call Dr. Schacht occurred after Arin and Whitney testified on the petitioner's behalf. Wohlford explained:

> [T]hey were terrific witnesses for [the petitioner]. They went into the lengthy explanation of their mother's problems, the family's problems, the problems of [the petitioner], problems of [the victim]. And they were so compelling, I guess is a good word, in their testimony that a number of people in the courtroom, including at least one juror, their eyes were watery with tears and they understood the - the - perhaps better than it could ever be brought out by anybody else what it was like to live in that family over time.

At the conclusion of the daughters' testimony, Newton, Wohlford, and Brewer met in Wohlford's office and discussed the powerful effects of the daughters' testimony. Wohlford noted that "only two instances of prior domestic violence came out" during the daughters' testimony. Newton "suggested that we should strongly consider resting on this - what we considered an emotional high point. That we probably wouldn't - might not get back to this emotional high point again anywhere else in the trial." Wohlford maintained that although he had the highest respect for Newton's abilities as a criminal defense attorney, he and Brewer were concerned because "we had already told the jury that they were going to hear psychiatric or psychological testimony. And if we rested without doing it, we were handing what was a very competent prosecution a club to . . . beat us up on in oral argument at the end." Counsel debated this issue and ultimately Wohlford and Brewer conceded to Newton's suggestion because he was lead counsel and had more experience in criminal law. Wohlford testified that as he and Brewer feared, during closing argument the State emphasized the defense's failure to present the proof they had promised.

Wohlford recognized that Newton wanted to prevent the jury from hearing about the previous altercations between the petitioner and the victim. However, Wohlford recalled that the jury had already heard about certain bad acts, namely that the petitioner had said a few months prior to the shooting, after he was charged with assaulting the victim, that "he would kill [the victim] before he would ever go back to jail." Wohlford stated, "I think if you had that statement without any explanation that it was far more harmful. Whereas if you have an explanation, as Dr. Schacht had, and what problems [the petitioner] was having emotionally, that that statement falls into the context of being understandable."

Wohlford also acknowledged that in closing argument the State "seized upon" the delay in seeking evaluation or treatment for the petitioner. Wohlford maintained:

> I didn't think . . . as a strategy for a criminal defense case that you ought to put your client in a residential mental health institute just for the purpose of - of trial later on unless he really sincerely needed that help and [the petitioner] never demonstrated to me, in the dealings that I had with him that . . . he needed that type of assistance.

Wohlford did not assess the petitioner's behavior when they were together during preparation for trial as being abnormal.

Wohlford stated that the theory of the defense was to demonstrate that the petitioner did not have the cool purpose necessary to form deliberation or premeditation as was required for first degree murder at the time of the offense. Wohlford theorized that it would be more difficult for the State to prove deliberation than to prove premeditation. Wohlford explained that "[i]t was simply a question of his mens rea as to whether he was guilty of a lesser degree of offense." Regardless, Wohlford acknowledged that Newton engaged the State in discussions regarding a possible plea. The "State's position was this was a First Degree Murder case and therefore there really was no room for negotiation."

The petitioner's brother, James Frederick Johnson, testified at the post-conviction hearing. He testified that during his career he served as an agent with the Federal Bureau of Investigation, then he worked in the Inspector General's office with the Department of Housing and Urban Development, finally serving as a Special Agent in Charge with the Criminal Division of the Environmental Protection Agency prior to his retirement. He maintained that when he asked Newton what defense Newton had planned for the first degree murder charges against the petitioner, Newton responded, "They'll . . . never convict him of First Degree Murder. The most he could possibly get is Second Degree." Newton believed that the State could not prove premeditation. According to James Frederick Johnson, Newton never changed this professional opinion.

Gary Brewer testified that he was an attorney in Morristown and had been practicing law for thirty-two years. Brewer also received Martindale-Hubble's highest rating of AV. Brewer acknowledged that he was not a criminal defense attorney and did not have much experience in the area of criminal law.

Wohlford associated Brewer in the petitioner's case after the trial court ruled that the jury would be selected from Hamblen County due to the "tremendously large amount" of publicity given to the case. Brewer was initially selected only to assist in jury selection. Newton was to be "chief counsel" in the case because of his experience in criminal defense. Newton told Brewer that the charge was first degree murder. However, Newton maintained that because of the evidence of passion and the petitioner's depression, the petitioner could be convicted of no more than second degree murder. Regardless, Brewer testified that "this case had First Degree Murder written all over for me and I'm not a criminal lawyer or profess to be, but I didn't fall off a rock truck either."

During his research of the case, Brewer learned that the petitioner had been on suicide watch for eleven days, commencing immediately after being jailed on the night of the shooting. Brewer questioned Newton regarding the petitioner's psychological treatment and was surprised to learn that none had been sought. Newton told Brewer that the petitioner would not attend treatment. Later, Brewer discovered that the petitioner had seen Dr. Schacht, Dr. Coccaro, and Dr. Ballenger several months after the shooting.

Three months prior to trial, Brewer learned that the petitioner had been drinking vodka immediately prior to the shooting. However, Brewer never saw the vodka bottle that was in the possession of the police. Brewer also never knew of the existence of a recording of the call Whitney made to 911 subsequent to the shooting. Brewer did not know why the vodka bottle or the 911 recording was not introduced as evidence at trial.

Brewer talked with Dr. Schacht prior to jury selection so that he would know what questions to ask potential jurors during voir dire. Brewer was impressed with Dr. Schacht and noted that Wohlford had thoroughly prepared Dr. Schacht to testify. Brewer also believed that Dr. Schacht's analysis of the petitioner was "absolutely correct, commensurate with what I had known about the facts of the case." Brewer admitted that the petitioner "had no aberrant behavior with me," but Brewer stated that Arin and Whitney had indicated that the petitioner was suffering from mental problems prior to and during the shooting.

Brewer discovered certain areas of the case which were not well-prepared. Specifically, Brewer discovered that defense counsel had not interviewed Arin and Whitney. "I voiced my opinion that I felt that they were absoluely critical to the defense of their father." Brewer was "afraid to ask" why the daughters had not been interviewed; instead, he volunteered to talk with them.

Brewer recalled the trial testimony of Fields. Prior to trial, Newton revealed to Brewer that he had not personally spoken with Fields. Brewer stated that it was "obvious" that the State would call Fields as part of their case-in-chief. Brewer opined that he did not know why Newton did not personally interview Fields, but Brewer opined that a personal interview with Fields was "tantamount to cross-examining him to me."

Brewer recalled that Newton said "in the presence of the jury that his cross-examination [of Fields] would be rather lengthy and he'd like permission from the Court to do it immediately after early luncheon recess." Brewer testified that Newton "went into a room somewhere here in the courthouse and it was his practice, I think, to be alone in preparation for a witness. And His Honor convened the court and [Newton] came in and stood up and said, 'I have no questions.'" Brewer stated that he was unaware that Newton planned to forego the cross-examination of Fields. Brewer opined that "everything could be gained" by cross-examining Fields. Therefore, he was surprised at Newton's decision not to cross-examine Fields.

Brewer acknowledged that during voir dire, he told the jury that the defense would present proof regarding alcohol abuse, the family trait of clinical depression, and suicide. He again made

such representations during opening statements. Brewer asserted, "I've talked to a lot [of] juries in my time. And a fatal, fatal, fatal flaw or a mistake that a lawyer could ever make in a trial of any kind is to tell a jury what they're going to hear and then don't tell them what . . . you told them you [were] telling them. They'll kill you." Accordingly, Brewer became upset when Newton announced that the defense was resting after the testimony of the petitioner's daughters. At the post-conviction hearing, Brewer explained:

> [N]ow my building blocks fell. I'd lied to the jury. . . . I was not happy. I wasn't serving any purpose in this case at that point. These were my folks . . . that were trying this case and I lied to them. I had no intent to lie to them. . . . I told them what they were going to hear and then they didn't hear it and that was a reflection upon me. I had to go back home with these folks.

Brewer recalled that the State emphasized counsel's failure to produce psychological testimony as promised. Brewer revealed that "if I could have crawled under that table at that point I would have." Brewer opined that the State's closing argument "[a]bsolutely destroyed" the petitioner's case.

Brewer conceded that during trial, counsel tried to avoid testimony regarding prior acts of domestic violence by the petitioner. Regardless, Brewer noted that Dr. Schacht's testimony was intended to encompass and explain all prior bad acts of the petitioner because Dr. Schacht believed such acts reflected the petitioner's mental illness. However, Brewer also noted that the evidence adduced at trial "[c]onsidered by itself," without the psychological explanation, could have been seen as evidence of premeditation and deliberation. According to Brewer, that was the reason Dr. Schacht's testimony was so crucial.

Brewer recalled that Arin and Whitney Johnson "describe[d] the deteriorating condition at the home. They describe[d] their mother's alcoholism, the effect the drinking had on their father, and, in great detail, their father's emotional state and condition the day of the murder." Brewer was "sure" he would have met with Newton and Wohlford after the conclusion of the daughters' testimony. However, Brewer did not recall discussing whether Dr. Schacht should be called to testify. Specifically, Brewer recalled that

> it was shortly before Dr. Schacht was to testify. And - and Mr. Newton told Mr. Wohlford and me that he didn't want to call or he decided not to call Dr. Schacht. And I think I spoke first and I said, "Why?" And he said, "I don't think the State's met their responsibility in this case." And I said, "[Newton], you've got to call him. I've already told the jury that he would testify. That they would hear this testimony and I would have lost my credibility with them." And - and he said, "I just don't think the State's met their

responsibility in this case. And - and I don't think we ought to call him."

And I objected to that. That was where - - that's what was important to me. I- - - you never tell a jury what they're going to hear and then don't tell them. What credibility I had was absolutely destroyed at that time, in my opinion.

After the petitioner rested at the post-conviction hearing, the State called E. Lynn Dougherty as its sole witness. Dougherty testified that he was an attorney from Bristol and that approximately eighty percent (80%) of his law practice consisted of criminal defense work. Dougherty was familiar with the work and reputation of Newton. Dougherty stated that "Newton, of all the attorneys I know in Bristol, was probably the most voracious reader amongst our bar. He was extraordinarily well read, both in, both from a legal sense, but also in a, in a more generic sense."

Dougherty testified that Newton spoke with him regarding the petitioner's case and Newton said "that he was concerned about the evidence in the case, but that he was confident that he could have that charge reduced from, from the first degree level. But he was, he made it very clear that there was evidence there that could support such a charge." Dougherty maintained that Newton was aware of the significance of the State's evidence against the petitioner but was confident he could obtain a conviction for a lesser offense.

Dougherty testified that he had occasionally decided not to cross-examine a witness if nothing could be gained from the examination, if the witness had not hurt his case on direct, or if he was concerned about the witness opening a door for more damaging testimony than had been brought out on direct. Dougherty also stated that in the past he had retained an expert witness and then decided not to call the expert. However, Dougherty opined that it would be "absolute error" to tell a jury during voir dire or opening statement that he intended to call an expert and then fail to call the expert during trial. Dougherty conceded that he could

imagine a scenario where through other evidence you were able to put before the jury what it was that you were trying to do with your expert. Or in a situation where you simply felt, again, after sitting at, through the trial, that the expert testimony would either be cumulative or it could be potentially hurtful.

Dougherty also opined that it "could be a tactable (sic) decision" not to call a promised expert if the State had not met its burden of proof.

Subsequent to the post-conviction hearing, the post-conviction court entered a lengthy order with detailed findings of fact, dismissing the petitioner's claim for relief. The post-conviction court found that the petitioner had not met his burden of establishing his claims by clear and convincing evidence. Moreover, the court determined that many, if not all, of the claims of alleged ineffective

assistance of counsel were attributable to the tactical or strategic decisions of counsel during the course of trial. The petitioner timely appealed the post-conviction court's ruling.[6]

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997).[7] "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

### A. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.

"To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

### 1. Failure to Call Expert

The petitioner complains regarding the failure of trial counsel, particularly Newton, to call Dr. Schacht to testify at trial. There are essentially two components to the petitioner's complaint. First, the petitioner alleges that counsel erred by not presenting expert testimony to explain his mental state. Second, the petitioner specifically argues that the failure to call Dr. Schacht to testify

---

[6] We will address the petitioner's issues in a different order than that in which they were raised in the petitioner's brief.

[7] Since the post-conviction hearing in the instant case, this provision has been codified at Tennessee Code Annotated section 40-30-110(f) (2003).

destroyed the credibility of the defense after the jury had been promised by counsel during voir dire and opening statement that the jury would hear expert testimony regarding the mental health of the petitioner. We shall address each of these issues in turn.

### a. Explanation of Mental State

First, we address whether counsel was ineffective in failing to present the testimony of a psychological expert. The petitioner contends that the proposed expert could have explained the petitioner's mental state leading up to and at the time of the shooting.

The record reflects that counsel failed to seek a psychological evaluation of the petitioner until months after the shooting. At that time, counsel contacted Dr. Schacht for an evaluation of the petitioner. The petitioner contends that the information garnered from Dr. Schacht would have been favorable to the defense, specifically in explaining the petitioner's mental state at the time of the shooting. However, after observing the teary-eyed reaction of some jurors, counsel determined that the defense should rest on the "emotional high point" created by the powerful and moving testimony of the petitioner's daughters. The post-conviction court noted:

> Although Dr. Schacht had information favorable to the [petitioner], he had and was aware of evidence that there was a prior threat, very similar in nature to the actual killing, and the act of placing a shotgun in the mouth of the victim was mean, cruel, and horrible.
>
> In such circumstances, any reasonable attorney would have to weigh the pros and cons , and the magnitude of potential damaging evidence to the theory that [the petitioner] did not deliberate or premeditate.

We concede that the question of the ineffectiveness of counsel on this issue is a close one. Specifically, we note that on direct appeal this court observed that "the question of whether deliberation, in particular, was established beyond a reasonable doubt is a close one. . . . Perhaps no one will ever know the [petitioner's] true state of mind at the time he pulled the trigger." State v. Harry David Johnson, No. 03C01-9712-CR-00526, 1999 WL 318830, at *8 (Tenn. Crim. App. at Knoxville, May 17, 1999). Such question could have been even closer if Dr. Schacht had explained his analysis of the petitioner's mental state. Nevertheless, we conclude that counsel's failure to call Dr. Schacht during trial was a tactical decision based upon counsel's assessment of the proceedings. See Goad, 938 S.W.2d at 369; Wilcoxson v. State, 22 S.W.3d 289, 315 (Tenn. Crim. App. 1999); John Parker Roe v. State, No. W2000-02788-CCA-R3-PC, 2002 WL 31624850, at *9 (Tenn. Crim. App. at Jackson, Nov. 20, 2002), perm. to appeal denied, (Tenn. 2003). However, although there was a tactical reason not to call the expert witness, when we consider this failure in conjunction with the promise made to the jury regarding the presentation of expert testimony, we conclude that the decision was not a reasonable one.

### b. Promise to Jury

There are two major cases in Tennessee dealing with the failure of counsel to fulfill the promises made to the jury during voir dire or opening statement. In State v. Zimmerman, 823 S.W.2d 220, 221 (Tenn. Crim. App. 1991), the defendant was charged with second degree murder. During opening statement, counsel stated, in accordance with trial strategy, that the defendant and a psychologist would testify regarding the defense of "battered wife syndrome." However, at the conclusion of the State's proof, counsel recommended to the defendant that she not testify. Id. at 222. Additionally, counsel rested without presenting the testimony of an expert regarding battered wife syndrome or any additional proof. Id. This court concluded that counsel was ineffective, stating that "nothing changed during the course of the trial. . . . In other words, there appears to have been no basis for the sudden change in strategy." Id. at 226.

In State v. King, 989 S.W.2d 319, 330 (Tenn. 1999), the defendant, who was convicted of felony murder, complained that his counsel "abandoned the defense theory of voluntary intoxication after having introduced it to the jury during the opening statement." During King's trial, his ex-girlfriend, Lori Eastman Carter,

> testified for the prosecution, over the objection of defense counsel, that [King] had attempted to kill her on October 13, 1982. According to Ms. Carter, the appellant hit her with a slapstick numerous times while repeatedly asking her "how it felt to be dying, so that the next woman he killed he would know how she felt." Ms. Carter testified that the appellant was sober when he attacked her with the slapstick.

Id. at 331.

At the post-conviction hearing, defense counsel asserted that "he decided to abandon the use of voluntary intoxication to defend [the defendant's] actions after the testimony of [the defendant's] ex-girlfriend, Lori Eastman Carter . . . [because] Ms. Carter's testimony was unexpected and devastating to the appellant's case." Id. Counsel asserted that "the theory of voluntary intoxication was rendered futile after Ms. Carter's testimony." Accordingly, counsel "revised the defense theory solely in response to the surprise testimony of Ms. Carter." Id. Our supreme court determined that counsel's change of strategy during trial did not constitute ineffective assistance. Id.

In the instant case, the post-conviction court observed in its order denying relief that "[t]he case before this court is similar to the King case except the surprise is not what proof the state put on but the proof they did not put on." However, from our careful review of the record, we conclude that the instant case is nearly identical to Zimmerman. The theory of defense from the inception of the case was that the petitioner acted under extreme passion and emotional duress at the time of the shooting, and, therefore, he could not form the requisite mens rea for first degree murder. Dr. Schacht was fully prepared to testify regarding the petitioner's mental state at the time of the offense. Acting according to the predetermined strategy which featured Dr. Schacht's testimony as an essential component, Brewer informed the jury during both voir dire and opening statement that they

-24-

would hear from psychological experts concerning the petitioner's mental state at the time of the shooting and the petitioner's family history of depression and suicide.

According to the testimony of Wohlford and Brewer, following the conclusion of the testimony of the petitioner's daughters, Newton believed that the defense should rest on the "emotional high point" created by their testimony. Brewer and Wohlford argued that to do so would damage the defense's credibility with the jury by leaving the jury with an unfulfilled and unexplained promise of expert testimony. Regardless, Brewer and Wohlford conceded to Newton's decision because Newton was acting as lead counsel and had experience in criminal law.[8]

The State argues that Newton made a tactical decision to not call Dr. Schacht because the jury had not heard testimony regarding certain bad acts. Prior to trial, Newton presumed that the State would present evidence of the prior acts of abuse. Accordingly, he wanted to take advantage of the State's failure to present such evidence. However, both Wohlford and Brewer testified at the post-conviction hearing that Dr. Schacht planned to testify regarding all of the petitioner's bad acts in order to explain the downward spiral of the petitioner's mental health. Dr. Schacht asserted that had the prior bad acts not been brought out in previous testimony, he would have related the acts to the jury in explanation of his analysis of the petitioner. Specifically, Dr. Schacht testified that

> [i]t was my understanding, again, that all of this information was going to come out through the other witnesses. In fact in the, in one of the outlines of proposed testimony that I provided to the attorneys I put that on the heading that this is, you know, this assumes that you're going to do all that stuff. Because that's what we had discussed. So if, if none of that had come in through other witnesses, then I suppose I would have had to do that myself.

In Zimmerman, this court cautioned that a "'trial attorney should only inform the jury of the evidence that he is sure he can prove. . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation.'" Zimmerman, 823 S.W.2d at 225 (quoting McCloskey, Criminal Law Desk Book, § 1506(3)(O) (Matthew Bender, 1990)). In the instant case, trial counsel failed to keep their promises to the jury, without a reasonable basis for such departure. All potential pitfalls regarding Dr. Schacht's testimony were known and considered by counsel prior to trial. If counsel had determined that a chance existed that Dr. Schacht would not be called to testify at trial, counsel should not have assured the jury that they would hear his expert testimony, or, in the alternative, should have offered the jury an explanation for the failure to call the expert. We note that "[t]he first thing that the ultimately disappointed jurors would believe, in the absence of some other explanation,

---

[8] In the order denying the petitioner's claim for relief, the post-conviction court remarked, "Although there is an old saying to the effect that victory has many fathers and defeat is a bastard, the old saying is not applicable in this case as all the credible proof indicates that Attorney Newton was to call the critical shots."

would be that the [expert was] unwilling, viz., unable, to live up to [his] billing." Anderson v. Butler, 858 F.2d 16, 17 (1st Cir. 1988).

In the instant case, counsel promised expert testimony to the jury and failed to explain the failure to keep that promise. Therefore, as in Zimmerman, "[w]e are . . . constrained to hold that the efforts of trial counsel were deficient, not necessarily with respect to preparation or investigation, but by the peremptory abandonment of the pre-established and reasonably sound defense strategy – providing for the testimony of . . . a psychologist." 823 S.W.2d at 224. Moreover, we conclude that there existed a reasonable probability of a different result at trial, namely a conviction of a lesser offense, had the promise to the jury been fulfilled.

### 2. Failure to Seek Prompt Treatment

Related to the foregoing issue, the petitioner contends that counsel erred in failing to seek prompt medical and psychological treatment for his mental problems after the shooting. The record reflects that the offense occurred on June 21, 1995. Newton and Wohlford contacted Dr. Schacht regarding an evaluation of the petitioner in November 1995.

While it may have been preferable to seek immediate professional help for the petitioner, particularly in light of the documented strangeness in his behavior surrounding the time of the shooting, we cannot definitively say that the petitioner was prejudiced by this failure. Moreover, we note that Wohlford testified at the post-conviction hearing:

> I didn't think as a . . . strategy for a criminal defense case that you ought to put your client in a residential mental health institute just for the purpose of – of trial later on unless he really sincerely needed that help and [the petitioner] never demonstrated to me, in the dealings that I had with him that . . . he needed that type of assistance.

See State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App. 1991). This issue is without merit.

### 3. Voluntary Intoxication

The petitioner also claims that counsel was ineffective in failing to pursue a defense of voluntary intoxication. At the post-conviction hearing, Wohlford testified that he and Newton discussed using voluntary intoxication as a possible defense. However, Newton asserted that in his experience as a criminal defense attorney, juries did not respond well to the defense of voluntary intoxication. Moreover, the post-conviction court observed that "the defense at trial was that the petitioner became passionate over his wife's drinking not his own. An effective attorney that is trying to get the jury on his client's side on . . . the basis that the wife was a long-term drunk might consider not making his client a drunk also." We conclude that counsel reasonably made a tactical choice not to pursue a defense of voluntary intoxication. We will not now second-guess that decision. See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982).

-26-

### 4. Failure to Cross-Examine Fields

The petitioner argues that counsel was deficient in failing to cross-examine the only eyewitness to the crime, Brad Fields. Initially, we note that the petitioner failed to call Fields to testify at the post-conviction hearing. Therefore, Fields' proposed testimony at trial is speculative at best. See Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990).

Additionally, Wohlford testified at the post-conviction hearing that Newton asked the trial court, in the presence of the jury, to begin his lengthy cross-examination of Fields after lunch so the questioning would not be interrupted. Wohlford also stated that he, Brewer, and Newton met during the lunch recess after Fields testified at trial. Counsel discussed the damaging effects of Fields' testimony and contemplated further damage that could be done by extended examination. Wohlford and Brewer suggested that Newton perform a limited cross-examination of Fields, confining the questions to the petitioner's unusual and detached behavior and his expressions of suicidal ideations. However, Newton suggested that little could be gained by cross-examining Fields; therefore, he determined not to cross-examine Fields. Wohlford explained that "Newton did not want to further imprint negative testimony in the minds of the jury." The post-conviction court noted, "If a cross-examination would only involve the witness repeating what had been brought out on direct, this would only reemphasize what had been brought out on direct examination." We conclude that this was a tactical decision made by counsel after considering the effects of Fields' testimony. While we might have chosen an alternate strategy, we will not now exercise hindsight in critique of counsel. See Hellard, 629 S.W.2d at 9.

### 5. Failure to Conduct Rule 404(b) Hearing Pretrial

The petitioner complains that "counsel did not seek a pretrial ruling on the admissibility of 404(b) evidence nor did [counsel] brief the issues in anticipation of trial." Initially, we note that the petitioner failed to cite any authority in support of his contention that counsel was ineffective in failing to pursue a pretrial ruling on the admissibility of 404(b) evidence, arguably waiving this issue on appeal. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

In relation to this issue, we note that Tennessee Rule of Evidence 404(b) provides:[9]

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

---

[9] Effective July 1, 2003, Rule 404(b) was amended. Regardless, we have cited the rule as it existed at the time of the appellant's trial.

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Prior to trial, the trial court offered the State and defense counsel an opportunity to argue regarding the admissibility of prior acts testimony. The trial court told both parties, "I wouldn't be insulted if each side presented a brief in fact. I won't require it, but if you all want to, I would welcome it." Wohlford testified at the post-conviction hearing that the trial court also gave counsel the option of arguing any Rule 404(b) issues during trial. Newton optioned to reserve argument regarding prior acts testimony until trial. Wohlford opined that if counsel had argued prior acts pretrial, the petitioner's already highly publicized case would have received even more media coverage. Moreover, Wohlford stated that Newton was prepared to deal with any Rule 404(b) issues during trial and seemed to have no difficulty addressing the issues as they arose.

We can discern no appreciable prejudice suffered by counsel's failure to seek a pretrial ruling on Rule 404(b) testimony. The State presented no testimony regarding prior acts of abuse by the petitioner during its case-in-chief. The prior acts testimony produced at trial was triggered by the testimony of defense witnesses. Even with a pretrial ruling, the prior acts evidence would have still been admissible as a result of the daughters "opening the door" to the testimony. Moreover, as the post-conviction court noted, this court determined on direct appeal that the testimony regarding the assault charge and the incident in which the petitioner smashed Arin's car window with a sledge hammer were admissible at trial. See State v. Harry David Johnson, No. 03C01-9712-CR-00526, 1999 WL 318830, at **9-10 (Tenn. Crim. App. at Knoxville, May 17, 1999). This issue is without merit.

### 6. Failure to Utilize Jencks Material

The petitioner claims that counsel was ineffective in failing to request and use Jencks material during trial, specifically in relation to Officer Joe Delp. Tennessee Rule of Criminal Procedure 26.2(a) provides:

After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the

-28-

witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

Rule 26.2 is Tennessee's version of the Jencks Act which was created as a result of the Supreme Court's decision in Jencks v. United States, 353 U.S. 657, 77 S. Ct. 1007 (1957). See State v. Brown, 871 S.W.2d 492, 494 (Tenn. Crim. App. 1993). It has been long established that "an officer's own investigation report constitutes a prior 'statement' by that officer, unless for some reason it fails to qualify under paragraph (F) [of Rule 26.2]." State v. Robinson, 618 S.W.2d 754, 760 (Tenn. Crim. App. 1981).

The petitioner argues that counsel should have requested the police report prepared by Officer Delp. Counsel should have then exposed on cross-examination that the report did not mention that the petitioner "smirk[ed]" at Officer Delp, nor did the report reflect that the petitioner asked Officer Delp, "Do you know who I am?" However, we do not discern any clear impeachment value from such a line of questioning because the report was not necessarily inconsistent with Officer Delp's testimony. As such, the petitioner has failed to prove prejudice by counsel's failure to request and use Officer Delp's police report. See Claude Francis Garrett v. State, No. M1999-00786-CCA-R3-PC, 2001 WL 280145, at *10 (Tenn. Crim. App. at Nashville, Mar. 22, 2001).

### 7. Jury Instructions

The petitioner also contends that counsel erred in failing to request several special jury instructions. The petitioner further contends that even if counsel did not err in failing to request special instructions, the trial court committed plain error in instructing the jury. We have examined the jury instructions as a whole, as we are bound to do, and we conclude that the instructions fully, fairly, and accurately describe the law as it was at the time of the offense. See State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 539-44 (Tenn. 1992).

Additionally, the post-conviction court observed, "The trial court charged that jury basically from the T.P.I. Criminal Pattern jury instruction omitting the offending language . . . that premeditation may be formed in an instant." We recognize that our supreme court has cautioned that "pattern jury instructions are not officially approved by this Court or by the General Assembly and should be used only after careful analysis. They are merely patterns or suggestions." State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997). Nevertheless, as the post-conviction court found, "considering that the trial court accurately charged the lesser included offense of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide, the court is of the opinion that the petitioner has failed to establish that trial counsel was ineffective under applicable . . . standards." We agree with the post-conviction court.

### 8. Counsel's Assessment of Case as First Degree Murder

Finally, the petitioner claims that Newton improperly assessed his case as a second degree murder case, not a first degree murder case, and thus all of his tactical decisions were tainted by this

assessment. We note that the testimony at the post-conviction hearing, particularly the testimony of Dougherty, revealed that Newton was well aware that the petitioner faced a charge of first degree murder. Nevertheless, Newton remained confident that he could convince the jury to convict the petitioner of second degree murder. Additionally, as the post-conviction court noted, "considering the status of proof at trial and as described by Judge Witt on direct appeal, it would appear that a reasonable and effective counsel might reasonably believe that the top might be second degree murder or less." This issue is without merit.

### III.  Conclusion

Based upon the foregoing, we reverse the judgment of the post-conviction court and remand for a new trial.

_____
NORMA McGEE OGLE, JUDGE