IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 11, 2023

**ELVIN PEARSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-1912     Monte Watkins, Judge**

_____

**No. M2021-01560-CCA-R3-PC**
_____

A Davidson County jury convicted the Petitioner, Elvin Pearson, of one count of felony murder and two counts of attempted first degree murder, for which he received an effective sentence of life imprisonment. He filed a timely petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, *pro se*, he contends that the post-conviction court erred when it denied him relief because: (1) the trial court committed plain error when it failed to give correct and complete jury instructions, denied his judgment of acquittal, and merged the offense of attempted voluntary manslaughter into felony murder; (2) he was deprived of his Sixth Amendment right to the effective assistance of counsel based on trial counsel's failure to move to dismiss the indictment; and (3) the State violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by failing to disclose a witness prior to trial. He further contends that: (4) his post-conviction counsel deprived him of a full and fair post-conviction hearing by not presenting the mother of his children, Diane Reid, as a witness, not asking trial counsel questions relevant to his issues, and failing to investigate the subject matter of his questions; and (5) the post-conviction court erred when it did not allow post-conviction counsel to withdraw from the case and denied the Petitioner the opportunity to address the court. Upon review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which MATTHEW J. WILSON, J., joined. CAMILLE R. MCMULLEN, P.J., filed a dissenting opinion.

Elvin Pearson, Wartburg, Tennessee, *Pro Se*.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Glenn Funk, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION
## I. Facts

The facts giving rise to the Petitioner's convictions stem from an April 15, 2006 shooting that was in retaliation for a drug transaction in which Andrew Shute took money from the Petitioner's brother, Marcus Anthony Pearson,[1] without giving him the drugs. *See State v. Elvin Hubie Pearson and Marcus Anthony Pearson*, No. M2007-02826-CCA-R3-CD, 2009 WL 1616678, at *1-7 (Tenn. Crim. App. June 10, 2009), *perm. app. denied* (Tenn. Oct. 19, 2009). Marcus Pearson and the Petitioner, went looking for Mr. Shute armed with guns, and came into contact with three of Mr. Shute's associates, Frank Newsom, Lamarco Comer, and Kenneth Scott, about Mr. Shute's whereabouts. When the three men tried to run away, the Petitioner shot multiple times at Mr. Newsom and Mr. Comer, striking Mr. Comer twice in the leg. *Id.* Marcus Pearson shot Mr. Scott in the back, killing him. *Id.*

Our court summarized the ensuing charges when we decided Marcus Pearson's petition for post-conviction relief, *Marcus Anthony Pearson v. State*, No. M2015-01159-CCA-R3-PC, 2016 WL 2779229, at *1 (Tenn. Crim. App. Feb. 9, 2016), *perm. app. denied* (Tenn. Oct. 19, 2016), as follows:

> On September 28, 2006, the Davidson County Grand Jury indicted [Marcus Pearson] and his brother, [the Petitioner], with the following charges:

| Count | Offense | Victim |
|-------|---------|--------|
| 1 | First Degree Premeditated Murder | Kenneth Easley Scott |
| 2 | Attempted First Degree Premeditated Murder | Lamarco Cornell Comer |
| 3 | Aggravated Assault | Frank Newsome III |
| 4 | Unlawful Possession of a Firearm | n/a |

> On July 20, 2007, the Davidson County Grand Jury issued a superseding indictment, charging [Marcus Pearson] and [the Petitioner] with the following offenses:

---

[1] Because the Petitioner and his brother share the same last name, we will refer to the Petitioner as, the Petitioner, and his brother as Marcus Pearson, throughout this opinion.

| Count | Offense | Victim |
|-------|---------|--------|
| 1 | First Degree Premeditated Murder | Kenneth Easley Scott |
| 2 | First Degree Felony Murder (committed during the murder or attempted murder of Frank Newsome) | Kenneth Easley Scott |
| 3 | First Degree Felony Murder (committed during the murder or attempted murder of Lamarco Cornell Comer) | Kenneth Easley Scott |
| 4 | Attempted First Degree Premediated Murder | [Frank Newsome, III][2] |
| 5 | Attempted First Degree Premeditated Murder | Lamarco Cornell Comer |
| 6 | Unlawful Possession of a Firearm | n/a |

Both indictments listed the offense date for each count as April 15, 2006.

## A. Trial

Our opinions on the Petitioner's direct appeal and Marcus Pearson's post-conviction appeal both use the same summary of the facts presented at trial. Those facts are as follows:

> [A]t about 11:00 a.m. on April 15, 2006, one of the victims, Kenneth Scott, left the house in which he lived with his parents. At about 2:00 p.m., Scott's father called Scott's cell phone to inquire whether Scott needed to be picked up and taken to work. Scott replied that he did not because he was riding with Frank Newsom, another one of the victims. At some point, Newsom and Scott picked up the third victim, Lamarco Comer, who needed help transporting his mother's broken-down car to the repair shop. After taking the car to the shop, Newsom, Scott, and Comer drove to Knoll Crest Apartments ("Knoll Crest").
>
> Newsom had spoken earlier in the day to Andrew Shute, who had told Newsom that he had agreed to sell $600 to $700 of marijuana to . . . [Marcus Pearson]. Shute had also told Newsom that he planned to "slick" Marcus out of the money, meaning that he planned to take the money from Marcus and

---

[2] While we are using the chart created by our court, *Marcus Anthony Pearson v. State*, 2016 WL 2779229, at *1, we have changed the victim in Count 4 to comport with the actual indictment.

3

leave without delivering any marijuana. Scott and Comer had no knowledge of this plan. Shute saw Newsom's car as it pulled into Knoll Crest; he called Newsom's cell phone and told Newsom to meet him at the top of the apartment complex. Newsom did so. Shute got into Newsom's car with Newsom, Scott, and Comer. Shute then called Marcus [Pearson], told him he was coming to Knoll Crest, and instructed Marcus [Pearson] to park at a particular place for their meeting. Shute instructed Newsom to drive him to that place.

Upon their arrival, Shute saw Marcus [Pearson's] gold Dodge Stratus in a parking space at the appointed location. Newsom parked in an adjacent space. Shute exited Newsom's vehicle and got into the backseat of Marcus [Pearson's] vehicle. Marcus [Pearson] was in the driver's seat and his younger brother, Ronald Ettienne, was in the front passenger seat. Marcus [Pearson] was parked in front of a building with a breezeway running through its center; Shute told Marcus [Pearson] that he had the marijuana in the breezeway and that he would return with it if Marcus [Pearson] gave him the money. Marcus [Pearson] did so. Shute exited Marcus [Pearson's] car, walked into the breezeway and, after turning around to make sure he was out of sight, ran to a waiting friend's car. They left.

Newsom, Scott, and Comer, drove away immediately after Shute entered Marcus [Pearson's] vehicle. They went to a nearby convenience store, returning to Knoll Crest between fifteen and sixty minutes later, intending to visit Newsom's sister's apartment in Knoll Crest's building F. As they parked in front of building F and exited the vehicle, Marcus [Pearson's] car and another unidentified car pulled up to the right. [The Petitioner] exited the unidentified car and walked toward Marcus [Pearson's] driver's side door, at which point Marcus [Pearson] exited the car.

Newsom, Scott, and Comer now faced the parking lot, with their backs to the entrance of a two-sided breezeway running away from them and through building F. Comer stood between Newsom and Scott; Scott stood on Comer's left and Newsom stood on Comer's right. [The Petitioner] and Marcus [Pearson] walked toward them. [The Petitioner] stood in front of Newsom, and Marcus [Pearson] stood in front of Scott. [The Petitioner] asked Newsom, "where your boy at?" Newsom, assuming he was referring to Shute, responded that he did not know. [The Petitioner] and Marcus [Pearson] each pulled out a gun; Marcus [Pearson's] gun was black and [the Petitioner's] gun was silver and black. [The Petitioner] pointed his gun at Newsom's face and chest. He then grabbed Newsom by the shirt and

4

demanded Marcus [Pearson's] money. Newsom responded that he could call Shute and produced Scott's cell phone, which he had been holding. Newsom dialed Shute's number and handed the phone to [the Petitioner].

[The Petitioner] put the phone to his ear for a few moments and then angrily hung up. It is not clear whether he spoke to anyone or heard a voicemail message. After hanging up, he grabbed Newsom again. At that moment, a car drove by through the parking lot and a woman yelled, "Hey, there's Booty Man" from inside. "Booty Man" is Newsom's nickname. Hearing this, [the Petitioner] and Marcus [Pearson] turned toward the parking lot. Seeing an opportunity for escape, Newsom pulled away from [the Petitioner], turned around, and ran through the left side of the breezeway. Newsom heard shots after he had taken about two steps and saw Comer running through the right side of the breezeway. As Newsom rounded the corner at the end of the breezeway he saw [the Petitioner] shooting at him. He then continued to run into the grass field behind building F. Newsom was not hit and did not see any bullets hit Comer or Scott.

As Comer began running through the breezeway, he saw Scott try to run around the building. Comer also saw [the Petitioner] shooting at him. A bullet hit Comer in the leg; as he tried to get up [the Petitioner] shot him two more times in the same leg. At about the time [the Petitioner] fired the third shot into Comer's leg, Comer saw Marcus [Pearson] shoot Scott in the back. Comer heard about fifteen total shots. Police later found eight .40 caliber cartridge casings, five of which were clustered at the right entrance to the breezeway near where Marcus [Pearson] had been. The other three fell near the left entrance. Police also found five 9mm cartridge casings at the left entrance, near where [the Petitioner] had been. Comer was shot with 9mm bullets, and Scott with .40 caliber bullets.

Newsom turned around when the shots stopped and saw Comer crawling out of the breezeway. He also saw Scott running through the field holding his stomach. Scott then fell down. He then saw a policeman run onto the field and check both Comer and Scott before going to the front of the building. Newsom then ran over to Comer, who was still talking. He told Comer to hold on. He then ran over to Scott, who was lying face down in the grass. Newsom intended to roll Scott over, but he was told not to by a member of the crowd that had gathered. Newsom stayed in the field with Scott and Comer until paramedics arrived.

Karen Carney, another Knoll Crest resident, lived in building G, the building immediately next to building F. Just before the shooting, she went out onto her back porch with her son. She then saw a neighbor named Carlos with whom she had experienced problems in the past. As a result, she went back inside. She then heard shots coming from outside. After putting her son under the kitchen table, she looked out her front window and saw three black males, each carrying a gun, get into separate cars and drive away. Two wore baseball caps and all three had braided hair. She looked out her back window and saw Comer and Scott lying in the field.

Officer Edward Draves of the Metro Nashville Police Department responded first to the incident. He had been at building R on another call when he heard ten to fifteen shots coming from the vicinity of building F, about fifty to seventy yards away. Later testimony established that the shooting occurred at about 4:50 p.m. As he reached the field behind building F, Officer Draves saw two black males, later identified as Comer and Scott. Comer was running toward Officer Draves, while Scott ran away from him. Officer Draves drew his weapon on Comer and told him to lay on the ground. Comer told Officer Draves that he had been shot. After patting down Comer and calling for backup, Officer Draves ran over to Scott, who had fallen down. Officer Draves ordered Scott to put his hands out, but he received no response. Officer Draves saw a bullet entry wound underneath Scott's left shoulder. After confirming that Scott had no weapons, Officer Draves rolled him over and observed a bullet exit wound above Scott's heart.

Officer Draves went to the front of building F. He found some casings on the ground and bullet strikes on the walls. He then returned to Scott and Comer. Other officers arrived about one minute later, and the first ambulance arrived three or four minutes later. A large crowd had gathered, and the ten or so total officers that had arrived worked to put tape around the crime scene.

Upon their arrival, paramedics cut Scott's clothes off and transported him by ambulance to Skyline Hospital. Other paramedics cut Comer's clothes off and transported him by ambulance to Vanderbilt Hospital. Newsom, still in the area, did not talk to police. Detective James Bledsoe of the Metro Nashville Police Department arrived on the scene at about 5:20 p.m. and began speaking to witnesses and supervising the area. After viewing Comer and Scott's bloody clothes in the field behind building F and learning which hospitals they had been transported to, Det. Bledsoe instructed another detective, Harold Burke, to go to Skyline Hospital and check on Scott. Detective Burke later called Det. Bledsoe to inform him that

Scott had never regained consciousness and had died at the hospital. Detective Burke also informed Det. Bledsoe that he had spoken to Scott's father at Skyline, who gave him a note that said "The Shooter" and listed Marcus [Pearson's] phone number. Scott's father had apparently received that note from Newsom's stepfather. Burke also spoke to Newsom and learned of Marcus [Pearson's] potential involvement in the shooting. Newsom's mother then insisted that he stop talking to the police.

The next day, April 16, 2006, Det. Bledsoe and Det. Burke visited Comer at Vanderbilt Hospital. Although he was drugged with pain medication, Comer's nurses and both detectives concluded Comer was lucid enough to speak to them. Comer testified at trial that he was "hallucinating" at the time and that he had no memory of Det. Bledsoe visiting him on April 16. Based on Newsom's information, Det. Bledsoe asked Comer to look at a series of six photographs. Upon reaching Marcus [Pearson's] photograph, the third in the series, Det. Burke saw Comer nodding his head. Comer said, "I think that's him." Detective Bledsoe then showed Comer the remaining photographs, followed by the first, second, and third photographs again. Upon reaching the third photograph for the second time, Comer said, "that's the one with the black gun." Comer also described the shooting to Det. Bledsoe and said that the second shooter was either Marcus [Pearson's] brother or cousin.

Detective Bledsoe spoke to Comer again on April 20, 2006. On that day, he brought another series of six photographs, one of which depicted [the Petitioner]. When Comer reached [the Petitioner's] picture he said, "That might be him but his hair is different." Comer went through the rest of the series and started over, as he had with the first lineup. When he reached [the Petitioner's] picture the second time, he reiterated his non-positive identification, saying that the person depicted could have been the second shooter but that his hair was too different in the picture to say for sure; the shooter had braids, whereas the pictures showed men with short hair. Comer did, however, positively identify both [the Petitioner] and Marcus [Pearson] as the shooters at trial. Comer had never met [the Petitioner] or Marcus [Pearson] before the shooting.

Later that day, Det. Bledsoe talked to Carney, whose name he had received from Officer Draves. She gave her account of what had happened but was unable to identify any of the perpetrators using Det. Bledsoe's lineups. Carney, who was "terrified" during her testimony at trial, explained that she recognized [the Petitioner] as one of the men she saw running from

7

the crime scene. Detective Bledsoe explained that he took into account Carney's claim that a third man, her neighbor Carlos, was involved in the shooting, but he disregarded him as a suspect after speaking to Newsom and Comer.

Detective Bledsoe did not speak to Newsom until April 26, 2006. Newsom explained that his mother had made him talk to a lawyer before speaking with the police. His lawyer recommended that he go to the police department and tell his story. During his conversation with Det. Bledsoe, Newsom positively identified both [the Petitioner] and Marcus [Pearson] using the same photographic lineups Comer had examined. Newsom had not spoken to Comer. Newsom also identified both [the Petitioner] and Marcus [Pearson] as the shooters at trial. He knew Marcus [Pearson] before the shooting because they had both worked at UPS for a short time; he had not known [the Petitioner].

The State introduced records from Cingular Wireless showing calling activity from Marcus [Pearson's] cell phone. Marcus [Pearson's] cell called Shute's cell a number of times between 2:43 p.m. and 4:44 p.m. on April 15, 2006. The State also introduced records from Bellsouth showing calls made from the land line in [the Petitioner's] residence on that day. [The Petitioner] did not own a cell phone. Calls were made from [the Petitioner's] land line to Marcus [Pearson's] cell at 4:23 and 4:24 p.m. Another call was made from [the Petitioner's] land line to another number at 5:34 p.m. A call was made to Marcus [Pearson's] cell again at 8:07 p.m. No other calls were made on the line during that time.

Scott's autopsy revealed that he had been shot twice. One bullet entered his back and damaged his left lung and his heart; the other entered his abdomen and damaged his small bowel. These wounds caused his death and were not survivable, but they were also not necessarily immediately disabling. Marijuana was found in Scott's system, but the quantity or exact time of use could not be determined.

The police did not recover any gun connected to the shooting. The State also did not present any physical evidence directly linking either [the Petitioner] or Marcus [Pearson] to the shooting.

[The Petitioner] and Marcus [Pearson] both chose to put on proof. [The Petitioner's] first witness, John Graves, worked at B & R Auto Sales ("B & R") on April 15, 2006. He received and processed car payments as

8

part of his duties. He testified that [the Petitioner] came to B & R around 5:00 p.m. on the day of the shooting to make a car payment. He remembered the time because he usually counted the day's payments around then in order to deliver them to the bank by 6:00 p.m. Graves introduced a receipt given to [the Petitioner] with Graves' signature on it; it did not contain [the Petitioner's] signature. The receipt was marked "4/15/06" and included [the Petitioner's] name, but it did not have a time stamp. Graves was not one hundred percent sure [the Petitioner] was the one who made the payment, but he believed it was him; he had no association with [the Petitioner] besides periodically receiving his car payments. He had never met Marcus [Pearson]. Graves did not see if [the Petitioner] had anyone with him. On cross-examination, Graves agreed with the State that, at a previous hearing, he had testified that [the Petitioner] came in "after 5:00" and before 6:00 p.m.

[The Petitioner] chose to testify and gave his account of the events of April 15, 2006. He woke up around 10:00 a.m. and did some household chores. He took a nap from 1:00 to 4:20 p.m. He then called Marcus [Pearson], who said the family was planning to attend a church play that evening. [The Petitioner] could hear in Marcus [Pearson's] voice that something was wrong; Marcus [Pearson] then told the Petitioner he had given money to someone for marijuana and that he thought the person had stolen the money. Marcus [Pearson] had been waiting for an hour for the person to come back. [The Petitioner] told Marcus [Pearson] he was stupid and that he should leave.

After hanging up, [the Petitioner] told his girlfriend, Dianne Reid, to dress their baby and get ready to leave for B & R, which [the Petitioner] wanted to reach before its closing time at 5:00 p.m. [The Petitioner], Reid, and their child left the house before 5:00 p.m.; [the Petitioner] believed they reached B & R about that time. [The Petitioner] and Reid next planned to stop at the beauty supply store. On their way there, [the Petitioner] stopped at a gas station to get gas and cigarettes; when there, he realized he did not have his driver's license. Reid also told [the Petitioner] she needed a refill for their child's bottle.

They therefore returned to their residence. [The Petitioner] went to the bathroom, made a call to a friend, and retrieved his driver's license and a bottle refill. He and Reid then drove to the beauty supply store, where they remained for forty-five to sixty minutes while Reid tried on wigs. They left the store at about 6:41 p.m.; [the Petitioner] could say so with specificity because they had been given a receipt that said 5:41 p.m., and Reid had

9

commented that the time was an hour early. [The Petitioner] had lost the receipt, however, and therefore could not introduce it. [The Petitioner] and Reid next went to Wal-Mart for about forty-five minutes. They then got cigarettes and gas and returned home. They arrived "after 8:00." [The Petitioner] then called Marcus [Pearson] and asked him about the church play.

[The Petitioner] heard two days later that Marcus [Pearson] had a warrant out for his arrest. [The Petitioner] realized it was a murder warrant when he saw the story on the news. He was shocked. [The Petitioner] was arrested on April 28, 2006. He had never met Scott, Comer, or Newsom, and had nothing to do with the shooting.

Marcus [Pearson] chose not to testify but called two witnesses. The first, Det. Willie Middleton of the Metro Nashville Police Department, testified that he helped investigate the shooting. During the course of his duties, he spoke to Comer and Comer's mother. At about 5:30 p.m. on April 15, 2006, Comer's mother had given him the name of Carlos Hart as her son's possible assailant, the same Carlos with whom Carney had experienced problems in the past and who Det. Bledsoe chose not to pursue as a suspect.

Marcus [Pearson's] and [the Petitioner's] mother, Cornelia Logan, also testified about her recollection of the events of April 15, 2006. Marcus [Pearson] had been at home when she woke up. She went to church at about 10:00 a.m. with her youngest son, Ronald Ettienne, and her eight-year-old daughter, Leah. She returned at about 1:30 p.m. to find Marcus [Pearson] still in the house. Because she planned to attend a church play later that evening, she took a nap from 3:00 to 5:00 p.m. When she woke up, she yelled for everyone to get ready for the play but received no response. Marcus [Pearson's] cell record reflected that he called Logan's cell at 5:15 p.m.; he told Logan that he and Ettienne had gone outside. They then walked into the house through the front door.

*Elvin Hubie Pearson*, 2009 WL 1616678, at *1-7. The State entered a nolle prosequi for the Petitioner's unlawful possession of a firearm charge. The jury then convicted the Petitioner for the one count of first degree premeditated murder of Mr. Scott (Count 1); two counts of first degree felony murder of Mr. Scott (Count 2 and Count 3); attempted first degree murder of Mr. Newsome (Count 4); and attempted first degree murder of Mr. Comer (Count 5). The trial court first merged the Petitioner's three murder convictions, as they were all for the same victim, and it sentenced him to life in prison for the murder conviction. It then sentenced him to twenty years for each of the two attempted murder

10

convictions. The trial court ordered that the two sentences for the attempted murder convictions run concurrently with each other but consecutively to the life sentence, for a total effective sentence of life plus twenty years.

The Petitioner, along with Marcus Pearson, appealed. *Id.* at *1. The Petitioner contended that there were several errors, including that the evidence was insufficient to prove premeditation, as well as several evidentiary issues, and that the trial court erred when it sentenced him. *Id.* After review, we affirmed the Petitioner's convictions, but we remanded his case for resentencing. *Id.*

## B. Post-Conviction

On June 4, 2010, six days before our opinion on his direct appeal was released, the Petitioner filed his *pro se* petition for post-conviction relief. The post-conviction court appointed him counsel on June 11, 2010, and the first amended petition was filed. On April 3, 2012, the post-conviction court granted this first counsel permission to withdraw because the Petitioner had filed a complaint against her and advised the court that he no longer wanted her to represent him. The post-conviction court appointed a second counsel on April 26, 2012, and second counsel filed a second amended petition on July 12, 2012. The court minutes reflect that on April 10, 2013, the post-conviction court held an evidentiary hearing and denied relief. Second counsel filed a notice of appeal.

After filing her notice of appeal, the post-conviction court allowed second counsel to withdraw because the Petitioner had filed numerous complaints against her. On November 25, 2013, the post-conviction court appointed a third counsel to represent the Petitioner for purposes of appeal. By order issued on August 14, 2014, and in response to the Petitioner's "motion for stay and issuance of writ of mandamus" and the State's "motion to remand," this court remanded the Petitioner's case to the trial court to conduct the resentencing hearing previously ordered by this court following the Petitioner's direct appeal of his convictions and sentence. On October 3, 2014, an amended judgment was entered reflecting that the Petitioner had been resentenced and that his sentences would run concurrently.

The record shows that fourth counsel filed a motion to withdraw in July 2017, which the post-conviction court granted. The post-conviction court appointed a fifth counsel, who filed an amended petition for post-conviction relief on September 5, 2019. Fifth counsel subsequently filed multiple amendments to the petition in January and March 2020. The final petition alleged trial counsel was ineffective because he: (1) failed to file a notice of alibi; (2) failed to call the Petitioner's alibi witness (Reid) at trial; (3) failed to provide evidence to contradict the State's case in chief; (4) failed "to bring out" Carney's contradictory testimony in his closing; (5) failed to have the private investigator testify to

11

findings at the trial; (6) failed to object to any of the jury instructions, thus, waiving such objections for appellate review; (7) failed to put on character evidence during the Petitioner's sentencing hearing; (8) failed to put the Petitioner's co-defendant on his alibi list; (9) failed to move for exclusion of an undisclosed State witness (Shute); and (10) waived multiple defects in the indictment and failed to file a bill of particulars as required.

The post-conviction court held evidentiary hearings on January 22, 2020, and November 10, 2021. The following witnesses testified at the hearing: the Petitioner, Reid, Marcus Pearson, trial counsel ("Counsel"), a private investigator, and the Petitioner's mother. The Petitioner attempted to have Carney testify via Zoom, but Carney ultimately did not appear. Below is a summary of the testimony relevant to the issues raised in this appeal.

The Petitioner testified that he told trial counsel that, on the day of the offense, he was with Ms. Reid,[3] who was the mother of his child, the entire day. The Petitioner said he informed Counsel in detail about his whereabouts on the day of the offense, gave Counsel Ms. Reid's contact information, and told Counsel that Ms. Reid would testify on his behalf. The Petitioner said he and Counsel discussed Ms. Reid serving as an alibi witness several times and agreed that they would rely on Ms. Reid's testimony to establish an alibi. The Petitioner explained that, at the time of the offense, he also had receipts confirming where he had been, but they were lost after he was jailed. The Petitioner said the only true alibi witness was Ms. Reid because she was the only person who could testify where he was at the time of the offense. He agreed that he had discussions with Counsel about the car dealership employee[4] testifying, but he denied that Counsel told him that the car dealership employee would be the only alibi witness at trial.

The Petitioner said Counsel told the jury in his opening statement that the jury would hear from Ms. Reid, but then he never called her to testify. The Petitioner acknowledged that Ms. Reid was incarcerated at the time of his trial. He denied having any discussions with Counsel regarding how Ms. Reid's incarcerated status would "play against [him] as [his] alibi witness[.]" The Petitioner said Counsel knew a week before trial that Ms. Reid was incarcerated because Counsel visited Ms. Reid in jail. The Petitioner acknowledged that he and Counsel thought Ms. Reid would be released early, but she "never got out early." The Petitioner was not concerned about Ms. Reid testifying in orange jail clothes because at least one other witness was also incarcerated at the time of trial. The Petitioner

---

[3] The transcript from the post-conviction evidentiary hearing spells this witness's last name as "Reed;" however, we will spell her name as "Reid" consistently with the trial transcript.

[4] The transcript from the post-conviction evidentiary hearing refers to John Graves as the car dealership owner; however, we will refer to him as the car dealership employee consistent with the trial transcript.

believed that had the jury heard the testimony of Ms. Reid, the outcome of his trial would have been different.

The Petitioner said that he was unaware that Counsel never filed a notice of alibi. He learned of this fact after he was serving his sentence. He said that, upon learning about this, he was "shocked," but it confirmed his suspicion that something did not go right during the trial.

The Petitioner said that when Ms. Carney testified at trial, she was unable to identify him as one of the individuals she saw running from the scene on the day of the offense. He observed Ms. Carney step down from the witness stand, and the prosecutor followed her outside the courtroom into the hallway. When Ms. Carney came back into the courtroom, she retook the witness stand and identified the Petitioner. The Petitioner acknowledged that Counsel objected to Ms. Carney retaking the witness stand and testifying. The Petitioner recalled that Ms. Carney testified on August 28, and the trial ended on August 30. Counsel, however, did not remind the jury of the inconsistency in Ms. Carney's testimony in his closing argument. The Petitioner further recalled that Counsel contradicted himself during closing argument because he told the jury in his opening statement that Ms. Carney would tell them that "she didn't see me, and then in fact, after . . . what transpired with the [Assistant District Attorney], she changed her testimony."

The Petitioner testified he believed Counsel was deficient for failing to object to the jury instructions on Counts 2 and 3 because the judge did not instruct the jury on voluntary manslaughter as a lesser-included offense. The State objected to this contention, arguing that under Tennessee law, it is settled that voluntary manslaughter is not a lesser-included offense of felony murder. The post-conviction court agreed and sustained the State's objection. The Petitioner then pivoted and said that Counsel should have objected and tried to get a voluntary manslaughter instruction even though it was not a lesser-included offense.

The Petitioner then contended that Counsel was ineffective because he did not call his brother, Marcus Pearson, as an alibi witness. The Petitioner opined that his brother would have testified that the Petitioner was not there the day of the shooting. The Petitioner, who had a military background, said that this was his first felony offense.

During cross-examination, the Petitioner testified that Marcus Pearson, admitted that he had committed the murder. Marcus Pearson, however, did not tell him who the second shooter was, and the Petitioner did not ask because "[i]t wasn't for [him] to ask." The Petitioner testified that he told Counsel that Marcus Pearson would take the stand during trial and admit that he committed the murder and offer an alibi for the Petitioner.

13

Diane Reid testified that it was important for her to be in court for the post-conviction evidentiary hearing because she was the Petitioner's alibi witness. On the day of the offense, Ms. Reid was with the Petitioner and their daughter the entire day. Ms. Reid recounted that day as follows:

> We had been home the majority of the day, that morning. And early afternoon, Saturdays was always our day to run errands, pay bills, things like that. And we left out about 4:30, between 4:30 and 5:00, because we had to go – our first stop was to go pay our car note, my car note. And we got there right before 5:00, because we almost missed them, and they made sure they got us in before 5:00, we paid the car note.

Ms. Reid said the Petitioner was driving that day and that the Petitioner went inside the car dealership to pay the car note. Ms. Reid stated that she remembered the day of trial, because she was supposed to testify but was incarcerated at the time on a probation violation for marijuana possession. She agreed that she had multiple theft convictions in her criminal history but said that Counsel was aware of these before he asked her to testify. Counsel had her brought from the jail to the courtroom, where she sat in the back, but he did not call her to testify.

Ms. Reid also confirmed the timeline of events for the day of the offense as testified to by the Petitioner, including that after paying the car note the two went with their infant daughter to a beauty supply store and a Walmart. She said they arrived home between 8:00 p.m. and 9:00 p.m. and she did not recall the Petitioner speaking to his brother on the way home. She did not learn about the offense until the next day.

Ms. Reid testified that, when officers came to arrest the Petitioner, they found weapons and a bullet proof vest in their home. Had she testified, she could have explained that those items belonged to the Petitioner because of his military service. She opined that a lot of military men have a "fascination for guns . . . ." Ms. Reid said she could have told the jury that the Petitioner did not have a violent or criminal history. Ms. Reid expressed that she was telling the truth.

On cross-examination, Ms. Reid agreed that, had she testified, she would have had to admit to the jury that she had five previous theft convictions from 2004 through 2006 and that she was incarcerated for violating her probation. Ms. Reid agreed that she had been convicted of theft at least twice since the Petitioner's first trial and that there were two other theft convictions associated with her name but those were allegedly committed by someone who used her name. Ms. Reid agreed that Counsel attempted to obtain video footage from the car dealership, the beauty supply store, and Walmart, but he was unsuccessful.

14

The court then spoke with Marcus Pearson, who the Petitioner said he was calling to testify on his behalf at the post-conviction hearing. The court reminded Marcus Pearson that if he testified to any matters that may incriminate him, it could impact any pending or future proceedings against him. Marcus Pearson then testified that he was present at the shooting and that the Petitioner was not with him that day. Marcus Pearson said that he had spoken with the Petitioner that day and that the Petitioner was at home. He said the Petitioner did not know that the shooting was going to occur, that there was no second shooter and that he was alone.

During cross-examination, Marcus Pearson said that he had not testified on his own behalf at trial. He said that he told both his own attorney and Counsel that he had committed the murder and that he could testify that the Petitioner was not with him at the time.

Counsel testified that he had been licensed to practice law for fifteen years and that the vast majority of his law practice concentrated on criminal defense. He said the court appointed him to represent the Petitioner from general sessions to appeal. He reviewed the proposed jury instructions for the Petitioner's case and did not recall any issues or misstatement of the law. He said that, had there been something he thought was objectionable, he would have raised it. He preserved and raised the issues he believed were appropriate on appeal. He said he was very familiar with the facts and allegation against the Petitioner. He believed he had a workable relationship with the Petitioner and said he provided the Petitioner with discovery in full. Counsel found the Petitioner inquisitive, engaged, and "very in tune" with his defense.

Counsel also said he had a good working relationship with Marcus Pearson's trial attorney, Robin McKinney. Counsel testified that, shortly before trial, Mr. McKinney approached him and said that Marcus Pearson had given him authority to disclose that he was in fact present at the shooting. Neither Mr. McKinney nor Marcus Pearson ever told him that Marcus Pearson was willing to testify and offer an alibi for the Petitioner. Counsel recalled that the Petitioner also never indicated that Marcus Pearson wanted to testify on his behalf and offer an alibi for the Petitioner. Counsel said that had any one of them indicated that Marcus Pearson was willing to so testify, he would have called Marcus Pearson on behalf of the Petitioner.

Counsel testified that he was prepared and did present an alibi defense. He explained that Mr. Graves from the car dealership testified and "was of course an alibi witness, but only a partial one[.]" He noted that the Petitioner said he had been at the car dealership at 5:00 p.m. the day of the shooting, which was ten or fifteen minutes after the shooting. Counsel noted that the dealership was a five to ten minute drive from the scene

15

of the shooting. He noted that "[u]nfortunately, though Ms. Reid maintained she was there, [Mr. Graves] couldn't corroborate that, he was inside of his office, I believe she was in the car outside is what she testified to and would have testified to at trial, so the two couldn't corroborate each other, but we did present that."

Counsel testified that Ms. Reid had multiple convictions for crimes of dishonesty, which concerned him. He called her to testify at the Petitioner's bond reduction hearing, which was about two months after the Petitioner was arrested, and her testimony there was similar to her testimony at the post-conviction hearing. Counsel or an investigator had attempted to locate any documentary evidence from any of the locations where Ms. Reid and the Petitioner said they had been, but they were unable to find anything to corroborate that account.

Counsel said that, before trial, the Petitioner told him that he had been home all day and that Marcus Pearson called him at around 4:00 p.m. and told him that he had been involved in a drug transaction in which the seller had taken his money and not given him the drugs. The Petitioner told Marcus Pearson that was "tough luck" and not to pursue the seller because "no good will come of it." The Petitioner told Counsel that he and Ms. Reid then ran errands together. Counsel felt that Mr. Graves from the car dealership was a "stronger" witness because he was a third-party witness with no affiliation with either party.

As to why Counsel did not call Ms. Reid to testify at the Petitioner's trial, Counsel stated as follows:

[E]verything that we talked about, she was prepared to say. I thought given – I thought [the Petitioner] testified well, and I thought that we had the corroborating witness. I thought it was going to be damaging that she was testifying while she was incarcerated. It was going to be concerning in front of a jury versus in front of a judge in a bond hearing is an entirely different setting regarding the crimes of dishonesty, so I thought that it would potentially be counter-productive. You had the mother of his child, it was almost too comprehensive. She said we were together 12 straight hours, never [out of] touching distance of each other except for the one time that it really would have helped when the other person saw them. And of course, none of the people who were the victims of this offense identified her being anywhere near there, so I mean, again [the Petitioner and his brother] said they weren't there in the first place, so it doesn't make any difference as far as that goes. But I thought that the jury would have had natural suspicions, and then adding into the fact that she was incarcerated and had a criminal record of dishonesty, I told him I though[t] that, you know, . . . it's a 50/50

16

call. I don't know whether that would have helped it or hurt. Obviously[,] an alibi that's accepted is a pretty comprehensive defense, and if they had believed her, then they could not have believed he was helping perpetrate this offense. On the other hand, if they thought she was fabricating this, everything that he said probably would have been discounted and our entire defense blown up.

I do remember having a conversation with him in the lock-up, I believe, saying that I don't think we should call her because of the reasons I just stated. And I don't know if you'd call it acquiescence, I don't remember getting a lot of pushback one way or the other. I don't remember him saying "I demand that you call, this is what we've talked about," et cetera. I also don't necessarily remember him saying something to the effect of, "Well you're the lawyer, if you think that's the best decision."

The Petitioner interrupted Counsel's testimony and accused Counsel of lying. The post-conviction court admonished the Petitioner. Counsel had testified he did "not" necessarily remember the Petitioner saying that.

Upon further questioning, Counsel said that he weighed the pros and cons of Ms. Reid's testimony. He did not recall the exact conversation, but he recalled telling the Petitioner that he did not intend to call Ms. Reid and that he felt that was a decision that was in the Petitioner's best interest. Counsel believed that the Petitioner "acquiesced" to that decision. Counsel said that he would rely upon the record as to whether he had filed a notice of alibi but, regardless, Ms. Reid was in the courthouse and available to testify.

About Ms. Carney, Counsel testified that he spoke with her four to six weeks before the trial, and she said that there were three boys running from the scene of the shooting and that she could not identify anyone from the lineup. Her testimony at trial changed "essentially 180 -degrees, and she only identified [the Petitioner], she did not identify [Mr. Pearson] when she came back to be recalled . . . ." Counsel felt that stressing this to the jury would have been a poor move. Ms. Carney was clearly "very uncomfortable" during the trial, she was pregnant at the time and did not feel well. Counsel said that he did not believe during trial, or even in hindsight, that stressing Ms. Carney's change in testimony would have aided the Petitioner's defense.

Counsel testified if he could retry the case, he would stress that the Petitioner received a call from his brother at 4:15 p.m., and even if the Petitioner immediately jumped into his car, he could not have arrived at the shooting scene for fifteen or twenty minutes. That left a very small window, about ten minutes, during which the shooting could have occurred. While it was not impossible, it was a very tight timeline.

17

On cross-examination, Counsel agreed that he knew at the time of his opening statement that Ms. Reid was incarcerated but he still told the jury in his opening statement that he was going to call her. He said he probably met with her the day before trial to work on her trial testimony. Counsel was "very concerned" about whether the jury would believe Ms. Reid, which is why he did not call her as a witness. When asked whether he believed Ms. Reid's story, he said he found her story "consistent."

Counsel addressed whether, in hindsight, he would have called Ms. Reid. He explained that the outcome of the trial was negative, which of course made him question his decision. That said, he still considered that the jury was going to view Ms. Reid as biased, she was going to testify in jail clothing, and she had multiple convictions for crimes involving dishonesty. Counsel said that, during the trial, he hoped he had created reasonable doubt with the tight timeline, the partial alibi witness and the Petitioner's testimony. He thought they "might have gotten where we wanted to be without her testimony and there was no risk, as far as damaging [the Petitioner's] story, if we didn't call her."

Counsel agreed that two of the State's witnesses testified in jail clothing. He noted, however, that the juxtaposition of the State's witnesses in jail clothes, and his witnesses in plain clothes, favored his version of events. Counsel again stated that he spoke with the Petitioner about his decision not to call Ms. Reid and explained to him the reasons why he thought that was a good decision.

Counsel agreed that this case was his first murder trial and that his experience was somewhat limited. He said that, in hindsight, he would have tried harder to settle the case and not tried it, although the Petitioner was "very clear that he did not want to have a settlement and that he wanted a trial." The State's best offer to the Petitioner was twenty-five years, which meant that, even had the Petitioner accepted the offer, he still would be incarcerated.

Counsel then stated that, while he had informed the jury during opening that they were going to hear from Ms. Reid, he did not explain why she had not testified during closing statements. He explained that an attorney is never sure what a jury picks up on. Therefore, while in hindsight he might be more "cautious" in what he promised the jury in opening, he still would not have explained it in closing. He said to do so, four or five days later in closing, would have been "counter-productive." Counsel reiterated that, given the Petitioner's testimony at trial, he did not think that calling Ms. Reid to testify, considering the risks, was prudent. Simply put, he did not think that they needed her testimony. In hindsight, he still felt that the Petitioner was better off not calling Ms. Reid.

18

Regarding Ms. Carney, Counsel said that he objected to her retaking the witness stand, that a jury-out hearing was held on the matter, and that this issue was raised and rejected on direct appeal. He also cross-examined her about the fact that she had spoken with him before trial and said that she could not identify anyone, as well as the fact that she had said during the trial that she could not identify anyone before identifying the Petitioner. He filed a motion for mistrial based upon her testimony, which the trial court denied, a decision that the Court of Criminal Appeals affirmed on appeal.

Counsel was recalled to testify by post-conviction counsel on the second day of the hearing, and he repeated much of his earlier testimony. He stated that he decided not to call Ms. Reid because she was in jail and convicted of crimes of dishonesty. He stated that he thought that the Petitioner had done "very well" testifying on his own behalf. He was concerned that Ms. Reid's testifying would be counter-productive. He spoke with the Petitioner about this decision, and he did not recall the Petitioner having a strong reaction either way. He reiterated that he was unsure whether calling Ms. Reid would have made the Petitioner any more successful. Counsel, however, agreed that she was the only other witness who was allegedly with the Petitioner for the duration of the day of the shooting. That said, Counsel maintained that Mr. Graves from the car dealership was the more important witness because he was a third-party witness and had no bias.

After post-conviction counsel asked her final question of the final witness, she advised the court that she and the Petitioner had reached an impasse. She stated that "[the Petitioner] would like me to ask questions that I do not – [.]" The court responded "[a]nd that's your choice. You are the attorney." She then told the court "I think, at this point in time, [the Petitioner] would like to fire me as his counsel." The court responded "[w]ell, too late at this juncture." Post-conviction counsel then advised the court that the Petitioner would like to give a closing statement to be followed by her own closing statement. The post-conviction court responded "[n]o, no, no, no, no, no, no. You – you are his attorney. You present in court. Unless he's representing himself *pro se*, and he can't do it at this juncture." The hearing then continued with the State's final cross-examination of Counsel. Following argument of the parties, the post-conviction court took the matter under advisement.

On November 23, 2021, the post-conviction court filed its order denying relief. The order listed the Petitioner's issues as ineffective assistance based on trial counsel's: (1) failure to file a notice of alibi; (2) failure to call the Petitioner's alibi witness; (3) failure to put the Petitioner's co-defendant on the Petitioner's alibi list; (4) failure to move for the exclusion of an undisclosed State's witness; (5) failure to bring out a witnesses contradictory testimony in trial counsel's closing; (6) failure to provide evidence to contradict the State's case in chief; (7) failure to have private investigator testify to finding at the trial; (8) failure to object to any jury instructions, thus waiving appellate review; (9)

19

waiver of multiple defects in the indictment and failure to file a bill of particulars; and (10) failure to put on any character evidence during the Petitioner's sentencing hearing. The post-conviction court did not address the Petitioner's claim that trial counsel failed to provide evidence to contradict the State's case in chief.

On December 27, 2021, the Petitioner, acting *pro se*, filed a notice of appeal. On January 19, 2022, this court filed an order noting that post-conviction counsel had not withdrawn from representation of the Petitioner and remained counsel of record for the Petitioner's appeal of the denial of post-conviction relief. In response to that order, the Petitioner sought to dismiss post-conviction counsel and proceed on his own. Because the record had not been filed, we deemed the Petitioner's request to proceed *pro se* on appeal as timely and remanded the matter to the trial court for a determination of the Petitioner's fitness to proceed *pro se* pursuant to *Lovin v. State,* 286 S.W. 3d 275, 287-88 (Tenn. 2009).

On March 21, 2022, the trial court appointed another attorney to represent the Petitioner. However, the order of the trial court did not address the dictates of *Lovin*, pertaining to the Petitioner's request to proceed *pro se*, nor did the order provide that a hearing was held in the matter. Accordingly, on April 20, 2022, this court remanded the matter a second time to the trial court to address the Petitioner's request to proceed *pro se*. By order on August 18, 2022, the trial court noted that a hearing had been held and that the Petitioner knowingly and intelligently waived his right to counsel. In an October 7, 2022 order denying the Petitioner's request to supplement the record, this court noted that the Petitioner had been granted permission to proceed *pro se*. This case is now properly before this court for review.

## II. Analysis
## A. Trial Court Errors

The Petitioner argues, for the first time, that the trial court committed plain error when it: (1) failed to give correct and complete jury instructions; (2) denied the Petitioner's motion for judgment of acquittal; and (3) merged the offense of attempted voluntary manslaughter into felony murder. The State responds, and we agree, that the Petitioner waived these claims by failing to assert them at trial or on direct appeal. In post-conviction proceedings, plain error review does not permit a court to review claims that have been waived or previously determined. *See Grindstaff v. State*, 297 S.W.3d 208, 219 (Tenn. 2009) (citing *State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000)). Because the Petitioner has waived these claims by not raising them at trial or on direct appeal, he is not entitled to relief. *See* T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding

before a court of competent jurisdiction in which the ground could have been presented unless [an exception applies]").[5]

## B. Ineffective Assistance of Counsel

The Petitioner next argues that he was denied the effective assistance of counsel when Counsel failed to: (1) move to dismiss the indictment or request a bill of particulars; (2) present Ms. Reid as an alibi witness as promised during his opening statement; (3) present Ms. Carney as a favorable witness as promised during his opening statement; and (4) object to the jury instructions.[6]

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth

---

[5] We have renumbered the Petitioner's issues for clarity. This section addresses the Petitioner's issues raised in sections I, II, and III of his brief.

[6] This section addresses the Petitioner's issues raised in sections IV and V of his brief, and section I.E. of his reply brief.

Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, considering all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). Under the two-prong test enunciated by *Strickland*, and adopted by our Tennessee courts, a defendant must show that counsel made errors that were so serious that counsel was not functioning as "counsel" as guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense so that he was denied a fair trial. The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.

Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing

22

alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369). A reviewing court will not second guess an informed tactical decision made by counsel. *Butler v. State*, 789 S.W.2d 898, 900 (Tenn. 1990) (citing *Hellard v. State*, 629 S.W.2d 4, 9-12 (Tenn. 1982)).

### 1. Dismissal of Indictment or Request for Bill of Particulars

First, the Petitioner argues that Counsel was ineffective by failing to move to dismiss the indictment or request a bill of particulars. The State contends, and we agree, that the post-conviction court properly denied relief based on the Petitioner's failure to establish deficient performance by clear and convincing evidence. The Petitioner concedes that Counsel was not questioned about this issue at the post-conviction evidentiary hearing. He argues that he is nevertheless entitled to relief because the lack of evidence is attributable to post-conviction counsel's error and deprived him of a full and fair hearing. He states:

> [i]t is the [Petitioner's] contention that the failure of [p]ost[-]conviction counsel to question trial counsel about the indictment deprived [the Petitioner] of an opportunity to present facts and argument regarding the issue and that because of this he was not afforded a full and fair hearing to support a conclusion of fact and law.

Because the Petitioner, however, has no constitutional or statutory right to the effective assistance of post-conviction counsel, this allegation does not excuse the lack of evidence to support this claim. *See House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995) (holding that an allegation that post-conviction counsel was ineffective "does not establish a legal excuse for failure to raise the issues in the initial proceeding"). Therefore, we agree with the post-conviction court that the Petitioner failed to establish that he is entitled to relief on this ground. Additionally, we conclude that the Petitioner received a full and fair hearing. In the post-conviction setting, a petitioner is afforded a full and fair hearing when he or she is "given the opportunity to present proof and argument on the petition for post-conviction relief." *House*, 911 S.W.2d at 714. In this case, an evidentiary hearing was held, and the Petitioner had every opportunity to present proof and argument. *See id*. The Petitioner, in fact, presented six witnesses to support his claims for relief and questioned them extensively. Therefore, the Petitioner is not entitled to relief on this issue.

### 2. Calling Ms. Reid to Testify

23

The Petitioner contends that trial counsel was ineffective by failing to present Ms. Reid as an alibi witness after telling the jury during opening statements that they would hear from her. This, the Petitioner contends, rendered his representation of the Petitioner ineffective. Reviewing this issue, the post-conviction court found:

At the time of trial, Ms. Reid was incarcerated. Testimony from the evidentiary hearing on this matter revealed that Petitioner's trial counsel felt that, in his professional opinion, Ms. Reid would not have been considered reliable to the jury because of her incarceration. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Because trial counsel determined Ms. Reid would be considered unreliable to the jury, trial counsel's failure to call Ms. Reid was not an error so serious as to deprive the Petitioner a fair trial. Therefore the Petitioner did not demonstrate, by clear and convincing evidence, deficient performance or prejudice from his trial counsel's failure to call Ms. Reid at trial.

Relying on *Zimmerman*, the Petitioner argues that trial counsel's failure to call Ms. Reid to testify after telling the jury during his opening statement that he would do so rendered his counsel constitutionally ineffective because he did not fulfill this promise to the jury. *See State v. Zimmerman*, 823 S.W.2d 220, 225-26 (Tenn. Crim. App. 1991). The State responds that Counsel's decision not to call Ms. Reid was not deficient because he believed that, even though he had told the jury Ms. Reid would testify, not calling her was in the Petitioner's best interest. The State notes that Counsel based this decision on the fact that she was incarcerated, she had multiple convictions for crimes of dishonesty, and she had a bias in favor of the Petitioner based upon their relationship and shared child. The State also noted that Counsel expressed concern because Ms. Reid might not testify exactly as the Petitioner did about the events of that day. After discussing it with the Petitioner, who did not "push back," Counsel chose not to call her. This decision, the State posits, was not deficient and did not prejudice the Petitioner. We agree with the State.

Because the Petitioner's argument relies, at length, upon *Zimmerman*, we take this opportunity to distinguish it from the present case. In *Zimmerman*, defense counsel associated with co-counsel to represent the defendant at trial for killing her husband. *Id.* at 221. Defense counsel knew the defendant's testimony was important, and the established defense strategy was to confront the State's evidence about the crime with the defendant's testimony. *Id.* at 228. Counsel said in the opening statement that the defendant was going to testify. *Id.* at 225. He also stated that a clinical psychologist would explain "'battered wife syndrome'" and testify in the defendant's favor. *Id.* at 221-22. This was "the strategy mapped out" by co-counsel, who approved of the anticipated defense. *Id.* at

24

Nevertheless, counsel abandoned the established strategy without any apparent basis for the decision and recommended to the defendant that she not testify, while the co-counsel recommended that she follow the established strategy and take the stand in her own defense. *Id*. at 222, 226. As a result of counsel's departure from the established strategy, co-counsel declined to participate in closing arguments because he felt he "couldn't face the jury." *Id*. at 226. Counsel also failed to call other defense witnesses, including the psychologist, whose testimony was later received at the motion for a new trial. *Id*. at 226-27. With this background, the *Zimmerman* court considered whether the cumulative effect of counsel's opening statement, failure to call certain defense witnesses, and failure to call the defendant, all of which were departures from the established strategy, cumulatively deprived the defendant of the effective assistance of counsel in the conviction proceedings. *See id*. at 228. In granting relief, this court said, "It may be that none of these three areas of deficient performance, standing alone, would have justified the grant of a new trial. Yet, we think that the cumulative effect of these errors deprived the defendant of a meaningful defense." *See id*. The *Zimmerman* case involved a wholesale, mid-trial abandonment of established strategy, with which co-counsel strongly disagreed. *Id*. at 224.

This is clearly not the set of facts presently before us. Here, Counsel informed the jury during his opening statement that they would hear from Ms. Reid. Yet during the trial, the Petitioner testified and offered his version of events, including that he was not present at the scene of the shooting. Counsel also offered the testimony of Mr. Graves who recalled that the Petitioner came in to the car dealership and paid his car note around the time he was allegedly at the shooting scene. Counsel opined that the Petitioner had testified effectively about his alibi, and that much of Ms. Reid's testimony would be cumulative. He also felt that Mr. Graves from the car dealership, who was an unbiased third party, effectively supported the Petitioner's version of events. He said that he established that the timeline for the shooting was tight, if not impossible. Considering Ms. Reid's criminal history, including crimes of dishonestly, her current incarceration, and her bias, he informed the Petitioner that it was his opinion that they should not call Ms. Reid to testify. The Petitioner appeared to acquiesce and offered no "push back" that Counsel could recall. Counsel noted that two of the State's witnesses testified in jail clothing, and he felt it was an advantage to the Petitioner if none of the defense witnesses testified in jail clothing.

We note that is well settled in Tennessee courts that"[o]pening statements are not evidence" and merely set forth the arguments and theories that will be relied upon by the parties at trial. *State v. Rimmer*, 623 S.W.3d 235, 276 (Tenn. 2021) (citing *State v. Thompson*, 43 S.W.3d 516, 523 (Tenn. Crim. App. 2000)); *see also e.g.*, *State v. Van Tran*, 864 S.W.2d 465, 475 (Tenn. 1993) (citing *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 732 (Tenn. 1978)); *State v. Self*, No. E2014-02466-CCA-R3-CD, 2016 WL 4542412, at *51 (Tenn. Crim. App. Aug. 29, 2016); *State v. Burford*, No. E2021-00655-CCA-R3-CD, 2022 WL 4350945, at *6 (Tenn. Crim. App. Sept. 20, 2022); *State v. Johnson*, No. E2012-

02303-CCA-R3-CD, 2013 WL 4767187, at *7 (Tenn. Crim. App. Sept. 4, 2013); *State v. Dowlen*, No. M2015-01582-CCA-R3-CD, 2016 WL 6581250, at *8 (Tenn. Crim. App. Nov. 7, 2016). It is true that we caution that "[t]he trial attorney should only inform the jury of the evidence that he is sure he can prove . . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation." *Id.* at 225 (quoting McCloskey, *Criminal Law Desk Book*, § 1506(3)(O) (Mathew Bender, 1990)). That being said, the key inquiry is whether there were developments during trial that prompted a legitimate change in strategy. *See id.* at 225-26; *see also Felts v. State*, 354 S.W.3d 266, 284-85 (Tenn. 2011).

As noted by the Petitioner, in *Johnson*, this court held that an attorney's failure to call an expert witness to testify as promised in voir dire and opening statements was deficient. *Johnson v. State*, 145 S.W.3d 97, 118-19 (Tenn. Crim. App. 2004). The defendant was charged with first degree murder, and the theory of defense was that the defendant acted under extreme passion and emotional duress. *Id.* at 118. During voir dire and opening statements, the attorney informed the jury that a psychological expert would testify about the defendant's mental state at the time of the offense. *Id.* The attorney then chose not to call the expert to testify, despite the expert being an essential component of the defense theory. *Id.* This court found the case similar to *Zimmerman* and stated that:

> The theory of defense from the inception of the case was that the petitioner acted under extreme passion and emotional duress at the time of the shooting, and, therefore, he could not form the requisite mens rea for first degree murder. Dr. Schacht [the expert] was fully prepared to testify regarding the petitioner's mental state at the time of the offense. Acting according to the predetermined strategy which featured Dr. Schacht's testimony as an essential component, [counsel] Brewer informed the jury during both voir dire and opening statement that they would hear from psychological experts concerning the petitioner's mental state at the time of the shooting and the petitioner's family history of depression and suicide.

*Id.* at 119. Therefore, the attorney's failure to call the promised witness was deficient. *Id.* at 118-19. Importantly, the *Zimmerman* and *Johnson* courts appear to be concerned with trial counsel's sudden and unexplained change in strategy, which appeared arbitrary rather than logical and deliberate. *See id.* at 226. Further, in *Johnson* the expert testimony that was promised could not be offered by any other witness.

We agree with the post-conviction court that Counsel's decision not to call Ms. Reid to testify based on his concerns about her perceived reliability was not ineffective. We similarly conclude that his pivot in strategy after informing the jury they would hear from Ms. Reid in opening was not ineffective. In this case, unlike *Zimmerman*, Counsel called

26

witnesses on the Petitioner's behalf, and the Petitioner testified. And unlike *Zimmerman* and *Johnson*, there was not an unexplained abandonment of the defense—that Petitioner was not present at the shooting—but only a change through which witnesses the testimony would be advanced. It appears that the Petitioner's own testimony, which Counsel felt adequately and effectively conveyed his alibi, caused Counsel to change his strategy of calling Ms. Reid, whom he believed might have done more harm than good to the Petitioner's case. Counsel made a judgment call, and offered a legitimate basis for his decision not to call Ms. Reid. A strategic call that, even in hindsight, he maintained was as likely for success as not. Counsel also decided that, as the trial progressed, it was better for the Petitioner to rely on a witness, namely the car dealership employee, who was unbiased and could partially support his alibi, rather than on Ms. Reid, about whose testimony he had legitimate concerns. *See Felts*, 354 S.W.3d at 285-86 (concluding no deficient performance when developments in the trial, including more favorable testimony from other witnesses, supported defense counsel's decision to change strategies despite promise in opening statement). Also, in this case, unlike *Johnson*, the promised testimony, here the Petitioner's alibi, could be offered through other witnesses, namely the Petitioner and Mr. Graves, the car dealership employee. As such, we conclude that Counsel acted reasonably and with thought, based on the testimony presented at trial, when he determined it was better not to call Ms. Reid. Importantly, he discussed this decision with the Petitioner, who did not insist that Ms. Reid testify.

We further conclude that the Petitioner cannot prove that he was prejudiced by Counsel's decision. Two witnesses testified about the Petitioner's alibi. The jury rejected this testimony. Instead, the jury accepted the ample testimony presented by the State. The proof in this case showed that there were two shooters with two different guns in two different locations, near each other. This was not a drive-by shooting, but rather an extended interaction between the victims and the shooters. The Petitioner grabbed one of the victims, Mr. Newsom, multiple times, and he held Mr. Newsom in close proximity to his uncovered face. Mr. Newsom knew Marcus Pearson because the two had worked together previously, and he consistently and repeatedly identified both Marcus Pearson and the Petitioner as being the shooters. Another victim, Mr. Comer, viewed six photographs in a lineup and only identified one picture as being possibly of the shooter. It was the Petitioner's picture, and he gave a non-positive identification twice, noting the Petitioner's hair may be different. He then positively identified the Petitioner as the shooter in court. A third witness, Ms. Carney, after a "terrified" start, positively identified the Petitioner as being one of the men who ran away from the scene of the shooting. The Petitioner admitted he had spoken with his brother before the shooting.

Given the weight of the evidence against the Petitioner, including three separate eye witnesses who identified him and his brother as the second shooter, we conclude that the Petitioner has not proven by clear and convincing evidence that Counsel's failure to call

Ms. Reid, after informing the jury during opening that he would do so, was so serious as to deprive the Petitioner of a fair trial. He is not entitled to relief on this issue.

### 3. Ms. Carney

The Petitioner argues, similarly, that trial counsel was ineffective by failing "to present Ms. Carney as a favorable witness" as promised during his opening statement. The Petitioner however, failed to raise this claim in the post-conviction court and therefore has waived it. *See* T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless [an exception applies]"). In his petition for post-conviction relief, the only claim related to Ms. Carney was that "trial counsel failed to bring out Ms. Carney's contradictory testimony in his closing." The post-conviction court denied relief reasoning that "trial counsel did object to allowing Ms. Carney back on the stand which was an adequate response to Ms. Carney's second testimony. Moreover, trial counsel filed a motion for mistrial the following day." The Petitioner attached to his brief a document labeled "Original Petition for Post-Conviction Relief," which raises this claim. The record does not reflect, however, that this document was ever filed. Therefore, the Petitioner has waived this claim and is not entitled to relief.

### 4. Jury Instructions

The Petitioner next argues that Counsel was ineffective in failing to object to the jury instructions. The post-conviction court determined that this failure was not ineffective because "the Petitioner failed to demonstrate any erroneous jury instructions. The Petitioner also failed to demonstrate that an objection to any of the jury instructions would have resulted in a different outcome[.]" The record reflects that the Petitioner failed to allege any specific error in the jury instructions in his post-conviction petition or at the post-conviction evidentiary hearing. Therefore, we agree with the post-conviction court that the Petitioner is not entitled to relief on this ground.

### C. Exculpatory Evidence

The Petitioner next argues that the State's failure to disclose Shute as a witness prior to trial violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The State responds, and we agree, that the Petitioner has waived this issue by not raising it in the post-conviction court. In his petition for post-conviction relief, the only claim related to Shute was that "trial counsel failed to move for the exclusion of an undisclosed State's witness[.]" Because the Petitioner alleges a *Brady* violation for the first time in this appeal, the issue is waived and the Petitioner is not entitled to relief on this ground. *See* T.C.A. § 40-30-106(g) ("A ground

28

for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless [an exception applies]").[7]

## D. Post-Conviction Counsel Errors

The Petitioner argues that errors of post-conviction counsel deprived him of a full and fair post-conviction evidentiary hearing. Specifically, he argues that post-conviction counsel violated her duties under Tennessee Supreme Court Rule 28 by: (1) refusing to ask trial counsel questions relevant to the issues raised in the post-conviction petition; and (2) failing to present Carney. Tenn. Sup. Ct. R. 28, § 6(C)(2). The State contends, and we agree, that the Petitioner received a full and fair hearing because the Petitioner presented proof to support his claims for relief.[8]

As the Petitioner acknowledges, there is no constitutional right to the effective assistance of counsel in a post-conviction proceeding. *See House*, 911 S.W.2d at 712. There is a statutory right to post-conviction counsel "to afford a petitioner the full and fair consideration of all possible grounds for relief." T.C.A § 40-30-107(b)(1); *Frazier v. State*, 303 S.W.3d 674, 680 (Tenn. 2010). This right, however, does not serve as a basis for relief on a claim of ineffective assistance of counsel in a post-conviction proceeding. *Frazier*, 303 S.W.3d at 680. Instead, the Petitioner seeks relief based on post-conviction counsel's alleged violations of Tennessee Supreme Court Rule 28. Tenn. Sup. Ct. R. 28, § 6(C)(2). Rule 28 requires that post-conviction counsel "review the *pro se* petition, file an amended petition asserting other claims which petitioner arguably has or a written notice that no amended petition will be filed, interview relevant witnesses, including petitioner and prior counsel, and diligently investigate and present all reasonable claims." *Id.* Though Rule 28 establishes a minimum standard to which post-conviction counsel are held, it does not provide any basis for relief. *Frazier*, 303 S.W.3d at 681 ("the rules do not provide any basis for relief from a conviction or sentence"); *Brown v. State*, No. W2017-01755-CCA-R3-PC, 2019 WL 931735, at *12 (Tenn. Crim. App. Feb. 22, 2019) ("post-conviction counsel's Rule 28 violations do not warrant a second post-conviction hearing"). Therefore, even if post-conviction counsel violated Rule 28, the violation would not entitle the Petitioner to relief. Additionally, as discussed in Section II.1, the Petitioner received a full and fair hearing. Therefore, he is not entitled to relief on this ground.

## E. Post-Conviction Court Errors

---

[7] This section addresses the Petitioner's issues raised in section VI of his brief.

[8] This section addresses the Petitioner's issues raised in sections VII and VIII of his brief.

Lastly, the Petitioner argues that the post-conviction court erred by: (1) failing to permit counsel to withdraw; (2) failing to inquire into the subject matter of the Petitioner's questions; and (3) denying the Petitioner the opportunity to address the court. He further argues that these errors deprived him of a full and fair hearing. The State does not address whether the post-conviction court erred but argues that the Petitioner received a full and fair evidentiary hearing. We reiterate our conclusion in Section II.1 that the Petitioner received a full and fair evidentiary hearing and review each alleged error below.[9]

First, the Petitioner argues that the post-conviction court erred by failing to permit counsel to withdraw. Upon our review, we conclude that the post-conviction court properly found that the Petitioner's request to represent himself was untimely.

Whether a petitioner has exercised the right to self-representation is a mixed question of law and fact reviewed de novo with a presumption that the trial court's findings of fact are correct. *State v. Hester*, 324 S.W.3d 1, 29-30 (Tenn. 2010). A petitioner has no constitutionally protected right of self-representation in post-conviction proceedings. The Post-Conviction Procedure Act, however, recognizes that petitioners have the right of self-representation in post-conviction proceedings. *Lovin*, 286 S.W.3d at 285; T.C.A. § 40-30-107(b). To exercise this right, a petitioner's request to represent himself or herself must: (1) be asserted in a timely manner; (2) be clear and unequivocal; and (3) reflect a knowing and intelligent waiver of the right to counsel. *Lovin*, 286 S.W.3d at 287-88.

The Petitioner made a request to represent himself after post-conviction counsel asked her final question of the final witness. Post-conviction counsel told the court "I think, at this point in time, [the Petitioner] would like to fire me as his counsel." The trial court found that the request was not timely, responding "[w]ell, too late at this juncture." Post-conviction counsel then advised the court that the Petitioner would like to give a closing statement to be followed by her own closing statement. The court responded "[n]o, no, no, no, no, no, no. You – you are his attorney. You present in court. Unless he's representing himself *pro se*, and he can't do it at this juncture." Because the Petitioner made the request after post-conviction counsel asked her final question of the final witness, the post-conviction court properly found that the request was untimely and the Petitioner is not entitled to relief on this ground. *See State v. Jenkins*, No. M2016-00270-CCA-R3-CD, 2017 WL 1425610, at *26 (Tenn. Crim. App. Apr. 21, 2017) (holding that request made after all of the proof had been submitted and both parties rested was untimely).

Second, the Petitioner argues that the post-conviction court erred by failing to inquire into the subject matter of the Petitioner's questions. The Petitioner claims that "[p]ost[-][c]onviction [c]ounsel refused to ask specific questions which were pertinent to

---

[9] This section addresses the Petitioner's issues raised in sections IX, X, and XI of his brief.

the issues and facts raised in the petition" and the "[p]ost[-]conviction court told [p]ost[-][c]onviction [c]ounsel that as the attorney it was her choice." However, post-conviction counsel was not required to ask the witness the Petitioner's questions, even if they were relevant to the issues raised in the post-conviction petition. While certain decisions must be made by a criminal defendant, an attorney retains the ultimate control over trial management, as they are better equipped to assess what is permissible under the rules and tactical considerations. *See Gonzalez v. United States*, 533 U.S. 242, 249 (2008). Therefore, post-conviction counsel was free to choose what questions to ask the witness and the court did not err in failing to inquire into the subject matter of the Petitioner's questions.

Third, the Petitioner argues that the post-conviction court erred by denying the Petitioner the opportunity to address the court. He complains that "the court . . . forced [p]ost[-][c]onviction [c]ounsel to continue with the proceedings against [the Petitioner's] wishes. [The Petitioner] attempted to address the court in regards to this matter, but the court denied [the Petitioner] the opportunity to be heard." The record does not indicate that the Petitioner requested the opportunity to be heard. Nevertheless, because the Petitioner was represented by counsel, the court's alleged refusal to allow the Petitioner himself to address the court was proper.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that the post-conviction court did not err when it determined that the Petitioner was not entitled to relief. As such, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

31